## Hanks et al. v. McDanell et al.

April 23, 1948.

244

B. S. Grannis and William G. Reed for appellants.

Frank S. Connely and Vest & Vest for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In March, 1936, J. H. McDanell died testate, a resident of Gallatin County. His will was probated in the Gallatin county court on April 20 of the same year, and it prescribed in part:

"After payment of my just debts and funeral expenses, I give and bequeath to my beloved wife, Sallie A. McDanell, all the residue of my property, real and personal, to be used, enjoyed and disposed of by her in any way she may choose with this provision however—that, should any of said property belonging to my estate remain at the death of my said wife, the same shall be divided equally among Mollie Bledsoe, Louisa Hanks, John W. McDanell and Flora Wooley."

The testator was survived by his wife, Sallie A. McDanell, who died testate on January 10, 1947. Her will was duly probated in the same court, the third clause of which says:

"I will the balance of my estate both real and personal to my sister Louisa A. Hanks her lifetime and at her death to L-Bledsoe Sr, W. A. Bledsoe and Mary Lee Stolz share and share alike." This action was filed in the Gallatin circuit court by the executor and devisees of Sallie A. McDanell against the devisees of her husband to whom he had devised the remnant of his estate that his wife did not consume in her lifetime. Plaintiffs sought a construction of the will of J. H. McDanell which they asserted gave to their decedent an absolute fee in the property devised to her by her husband. On the other hand the defendants in their answer alleged that J. H. McDanell devised to his wife only a life estate and that the devise to them of the remnant thereof that the wife did not consume during her lifetime was and is valid. The court sustained that contention and adjudged "that the said Sallie A. McDanell took a life estate with power of disposition, and for this reason the limitation over to Mollie Bledsoe, Louisa Hanks, John W. McDanell, and Flora Wooley is valid, and they and their heirs and/or devisees now take that part of the James H. McDanell estate remaining in the hands of Sallie A. McDanell at the time of her death." From that judgment plaintiff prosecutes this appeal.

There is thus presented to us the question whether or not the ancient and universally applied rule by all courts that the intent of the maker of a written document, as gathered from its four corners, shall prevail unless such intent conflicts with some statutory provision within the jurisdiction, or is against public policy. That rule is referred to generally as the cardinal rule for the construction of written documents and especially as applied to deeds and wills. It is also described as the "Polar Star" interpretive rule, which designation this court has adopted in a number of its opinions. Notwithstanding that super governing rule this court, and perhaps a few others, have maimed it and have taken a large bite out of it by adjudging that when the first taker of conveyed property under the writing submitted for construction, is initially conveyed a fee title it is then incompetent and invalid for the maker to thereafter modify, qualify or reduce the apparent fee title of the first taker so as to reduce it to a life estate and that any gift over of any remnant after the death of the first

taker is null and void. The only reason given for that departure from the Polar Star rule is that it is against public policy for the maker of the conveyance to cut down, or otherwise modify, or qualify the first taker's title from an apparent fee to a lesser or life estate. That rule which we conclude is an arbitrarily established one, as will hereinafter be pointed out, will be referred to as the "Biting" rule.

It will be remembered that the Polar Star rule is that the intent of the maker of the instrument shall prevail and be enforced, *unless it antagonizes a statute or is against public policy*. We have no statute forbidding the modification or qualification of the apparent fee title given to the first taker so as to reduce that title to a life estate. Therefore, the only ground for the declaration and application of the "Biting" rule, which as we have said has prevailed in this state for a number of years, is that it is *against public policy*.

In Vol. 35 of Words and Phrases, Perm. Ed., the compiler thereof, beginning on page 274 and extending to and including page 291, cites a multiplicity of cases defining Public Policy as administered by courts other than legislative action, a typical definition of which is found in the case of Pittsburgh, C., C. & St. L. R. Co. v. Kinney, 95 Ohio St. 64, 115 N. E. 505, 506, L. R. A. 1917D, 641, Ann. Cas. 1918B 286, in which that court said:

" 'Public policy' is the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like; it is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men having due regard to all the circumstances of each particular relation and situation."

The text in 12 A. J. 662, 663, sec. 167, defines public policy, the violation of which will render a transaction void, thus:

"The test is whether the parties have stipulated for something inhibited by the law or inimical to, or inconsistent with, the public welfare. An agreement is against public policy if it is injurious to the interests of the

public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society and is in conflict with the morals of the time.''

That definition, in substance, is the same as that given by all text writers. In the case of City of Princeton v. Princeton Electric Light & Power Co., 166 Ky. 730, 739, 179 S. W. 1074, 1078, we defined public policy as ''A principle of law which holds that no one can lawfully do a thing which tends to be injurious to the public or is contrary to the public good (citing 32 Cyc. 1251) * * * and where there is no legislative prohibition of a certain character of agreement before a court is authorized to declare it void, it must appear that such an agreement or contract has a tendency to injure the public or is against the public good, or is contrary to sound policy and good morals (citing 9 Cyc. 482).'' (Our parentheses)

In Vol. 6 of Caldwell's Kentucky Judicial Dictionary beginning on page 2249 under the heading of ''Public Policy'' a number of opinions of this court defining it is given in which the same definition of public policy, the violation of which will invalidate a transaction, is approved. Pages of court opinions and text could be cited substantiating and approving the scope and meaning of public policy as comprehending only the protection and promotion of the public welfare, including public health and looking to the protection and advancement of morality as stated in the above definition. But since all courts adopt the same meaning of the phrase we will not encumber this opinion with a listing of them. The ''Biting'' rule to which we have referred cannot from any viewpoint be held as being in accord with such definition of public policy. To first vest one with a fee title, but in the same conveying instrument manifest an intent and purpose to limit it to a life estate (even with power to encroach upon the corpus of the property) and then direct that if the first taker should die without appropriating for his personal benefit the entire property, the remnant thereof should go to others is not forbidden by any definition of public policy. Therefore, the ''Biting'' rule heretofore followed by this court is without

logic, reason or any stable foundation, leaving it an unauthorized and erroneous limitation of the requirements of the Polar Star rule. Being such, it becomes a dead limb on the body of the law, and we have concluded it to be our duty to remove it therefrom and to return to the broad highway of the Polar Star rule in the interpretation of written agreements or transactions, especially deeds and wills. We have so concluded in order to remove confusion and confliction, as well as contradiction, which the wholly unfounded ''Biting'' rule has injected into the law.

In the recent case of Berner v. Luckett, Com'r of Revenue, 299 Ky. 744, 186 S. W. 2d 905, 906, after rehearsing the well-settled ''Polar Star'' rule for the guidance of courts in the interpretation of written instruments we expressed our dissatisfaction with the ''Biting'' rule by saying:

''Very plausible arguments have been advanced to this Court in recent years for the abolition of the void gift over rule on the theory that it runs afoul of the cardinal rule of construction, namely, look to the instrument as a whole to ascertain the intention of the maker. We are frank to admit that a review of some of our decisions involving the question under consideration here indicates that there have been instances where our decisions have apparently defeated the intent of the maker of the will.''

The push therein made against that rule did not remove it from the broad highway mapped out by the Polar Star rule and we have therefore concluded in this opinion to finish the job and remove it entirely therefrom.

In the Berner case it was concluded that the limiting language employed by the maker of the will disposed of his entire estate after the death of the first taker, thereby reducing his estate to one for his life only, as was also done in the case of Price v. Price, 298 Ky. 608, 183 S. W. 2d 652, in neither of which was there an attempted disposition of any *remnant* of the maker's estate after the death of the first taker. But the whole of an estate necessarily embraces all of its parts and if the first taker's estate may be later limited to one for life by disposing of *all* of it to others it would then

appear to be axiomatic that the maker could also dispose of what the first taker had not consumed during his lifetime.

But, at this point it is suggested by learned counsel for appellants that the doctrine of stare decisis prevents our overruling former opinions adopting and applying the "Biting" rule, but we are not so convinced. The doctrine at most possesses only persuasive effect. If the overruled opinion or opinions are clearly erroneous and are confusing and conflicting, as well as contradictory of ancient and well-settled rules, courts possess the right, as well as the duty, to remove such former obstructive opinions from the body of the law. The text in 14 A. J. 341, sec. 124, treating of courts, says:

"Notwithstanding the rule of stare decisis, or inclination to follow precedents, the courts have the power, and frequently exercise it, of departing from rules which have been previously established. The strong respect for precedent which is ingrained in our legal system is a reasonable respect which balks at the perpetuation of error, and it is the manifest policy of our courts to hold the doctrine of stare decisis subordinate to legal reason and justice and to depart therefrom when such departure is necessary to avoid the perpetuation of pernicious error. Accordingly, the authority of precedents must often yield to the force of reason and to the paramount demands of justice as well as the decencies of civilized society, and the law ought to speak with a voice responsive to these demands."

In note 12 to that text the author cites a great number of cases from different courts, including Oliver Co. v. Louisville Realty Co., 156 Ky. 628, 161 S. W. 570, 51 L. R. A., N. S., 293, Ann. Cas. 1915c, 565. The effect to be given to the doctrine, as affecting "Rules of Property," is thus stated in the same volume, page 343, sec. 126:

"While it is true that long acquiescence in an erroneous decision, so that it has become a rule of property or practice, may raise it to the dignity of law, thereby preventing the courts from overruling such a decision wherein the rule established has become a rule of property under which rights have been acquired and adjusted, yet it must not be understood that a previous

line of decisions affecting even property rights can in no case be overthrown."

The doctrine of stare decisis is never mandatory, and no court has ever held, and no text has even been written, so far as we have been able to discover, that it should be given the effect to padlock or choke the courts so as to force them to continue to perpetuate error. It is true that where rules of property as adjudged in former opinions are involved courts will exercise greater caution in overruling them, but the reason for that greater caution is to preserve rights that have been acquired under the overruled opinions, which some courts have held that an overruled opinion was never the law. That theory, however, is not only exploded by logic and common sense, but it is as fallacious as it would be to say that a repealed statute was never the law. We so held in the Oliver case supra and in two of the more recent cases of Payne v. City of Covington, 276 Ky. 380, 123 S. W. 2d 1045, 122 A. L. R. 321, and Daniel's, adm'r v. Hoofnel, 287 Ky. 834, 155 S. W. 2d 469. There are other domestic cases to the same effect.

The cautionary rule against overruling prior cases settling rules of property, to which we have referred, becomes eliminated when the overruling opinion reserves such rights by giving that opinion only prospective effect, as was done by us in the Payne and other opinions.

We have concluded that all of our former opinions recognizing and applying the "Biting" rule should be and they are now expressly overruled, but that this opinion shall have only a prospective effect and not apply to or affect any vested rights acquired under that rule while it was in force and effect, all of which rights are expressly preserved and upheld.

It therefore follows that the opinion of the trial court is correct, and it is accordingly affirmed.