ERMAN ET AL., APPELLANTS, *v.* ERMAN ET AL., APPELLEES;
ERMAN, APPELLANT.

(No. 8110—Decided July 23, 1956.)

Messrs. *Gatch, Kleinmann, Roberts & Kuhn,* for appellants.

Messrs. *Nichols, Wood, Marx & Ginter* and *Mr. Robert F. Reckman,* for William Erman and Richard Erman, appellees.

Messrs. *Paxton & Seasongood, Mr. Robert P. Goldman* and *Miss Martha Betty Semmons,* for trustees and executors, appellees.

MATTHEWS, J.   This appeal on questions of law and fact brings before this court the issue of whether certain corporate stock belongs to the estate of Joseph Erman, deceased, or to the estate of Effie Erman, deceased.   By stipulation, the issue was presented on the record made at the trial in the Common Pleas Court.

Joseph Erman died testate on or about January 10, 1935, and his will was duly admitted to probate in the Probate Court of Hamilton County, Ohio.   His will contains several provisions, but this contest concerns chiefly the provision of item V, which reads:

"Item V.   I give to my sister, Effie Erman, the sum of twelve thousand five hundred dollars ($12,500), subject to the terms and conditions hereinafter set forth.   She is to have the full use and disposition of this, both of principal and income, during her lifetime, with full power to consume or dispose of the principal as she sees fit.   Any principal of this gift or of any investment she may have made of it during her lifetime that remains at her death shall go to my mother, if she be then living, with the same powers as to the principal and income as my said sister had.   On the death of the survivor of my said sister Effie and my mother, any principal remaining of this gift shall go to my trustees hereinafter appointed, to be used as the balance of my funds left in trust; or if the trustees have already disposed of the funds in their hands and terminated the trust estate, then it shall go to the beneficiaries of the trust then living, in accordance with the terms of the trust hereinafter provided.   Neither my executors nor trustees shall have any control over the gift provided in this item or the property in which it is invested so long as my said sister Effie, or my mother, or either of them are alive, and the trustees shall not be accountable for any of said funds except such as they actually receive at the death of the survivor of my said sister and my mother."

It will be observed that item V, by express words, creates two life estates in succession. The first life estate is given to Effie Erman, followed by a life estate to her mother, if she should survive Effie Erman. As the mother died less than two years after Joseph Erman's death, and during Effie Erman's life, her intervening estate is unimportant in our consideration of this case.

The first question that presents itself is as to the extent of the estate bequeathed to Effie Erman. Is it a life estate, or, by virtue of the powers conferred upon her in relation thereto, so extensive as to enlarge it into a complete and absolute title? The plaintiffs-appellants contend for the former, and the defendants-appellees for the latter.

We find this subject of the enlarging of an estate by the powers conferred and the subject of inconsistent and repugnant provisions following the granting clause in conveyances have come under frequent discussion in cases in other jurisdictions. The cases seem to fall into two general classes. The first class includes those cases in which an indefinite estate is followed with absolute power of disposal. As to such disposition, it is said in 19 American Jurisprudence, 576, Section 120:

"* * * but if the primary gift vests in the first taker an absolute interest in personal, or an absolute fee simple in real, property, the entire estate is exhausted, so that there can be no valid limitation over. Thus, where an absolute gift to a person is followed in the same instrument by a gift over in case of that person dying intestate, or without having disposed of the property, the gift over is said to be repugnant and is void. * * *"

The other class embraces cases in which a life estate is created by the express terms, followed by a grant of unlimited power to dispose of the entire title. As to the estate thus created, it is said in 19 American Jurisprudence, 577, Section 121:

"It is a well-settled rule that if a life estate is expressly created by the terms of a deed or will or if a gift is so construed as to constitute a life estate, the mere addition thereto of a power of disposal does not render invalid an executory limitation on grounds of repugnancy. The estate created by the exercise of the power does not take effect out of the interest of the life ten-

ant, but out of the estate of the grantor of the power not embraced in the life interest. The principle underlying the rule is that if a life estate has been created by the terms of a deed or will, under the majority rule, such life estate is not enlarged into a fee simple by the power of disposal, and a gift over is not, in most jurisdictions, considered repugnant to an estate created, even though the holder of such estate has an absolute power of disposal, provided the estate or interest of such tenant is only for life, and not in fee.''

It will be seen by reference to item V of Joseph Erman's will that the estate of Effie Erman is expressly limited to a life estate and that according to the prevailing rule in other jurisdictions, the subjoined powers, although unlimited, do not enlarge such life estate into an absolute estate. And such a conclusion is certainly in conformity to the intent of the grantor or testator.

In *Hanks* v. *McDanell*, 307 Ky., 243, 210 S. W. (2d), 784, 17 A. L. R. (2d), 1, to which is attached an elaborate annotation, the Kentucky Court of Appeals applied this rule to a deed in which there was no express limitation for life. It held, as stated in the third paragraph of the A. L. R. headnotes:

''A provision of a deed or will modifying or qualifying an apparent fee title given by it, by a limitation over, so as to reduce the title to a life estate, with power to encroach upon the corpus of the property, contravenes neither statute nor public policy.''

At pages 26 and 27 of the A. L. R. annotation to that case, it is said:

''Most noticeably in recent years, and to some extent for a long time, the opinions have disclosed a growing impatience with the rule invalidating a limitation over of property undisposed of by the first taker where he is given the fee, or in case of personalty the analogous interest. The rule has been referred to as 'archaic, arbitrary and vexatious,' as a thing from which deliverance would be welcome, as constituing 'simply a trap for the grantor or testator who is not learned in the technicalities of the law'; and as especially deserving of the latter description because of the fact that the practical result obtainable by the executory limitation, were it valid, can in every re-

spect be had by designating the first taker as a life tenant and adding thereto unrestrained powers of disposition and a remainder gift of property not disposed of.''

So, we conclude that the weight of the authorities sustains the validity of the gift over of that which remains of this bequest at the time of the death of Effie Erman.

We think this is especially true in view of the express limitation for her life and the implication in the power conferred that it should be exercised only for her consumption of the bequest and therefore is not an absolute power.

Finally, on this subject, we are of the opinion that the case of *Johnson* v. *Johnson,* 51 Ohio St., 446, 38 N. E., 61, in which language no more definite than the language of Joseph Erman's will was construed to create a life estate with power to consume the entire estate, and did not confer an absolute title, requires us to sustain this provision of Joseph Erman's will.

Referring to *Johnson* v. *Johnson,* and similar cases, it is said, in *Robbins* v. *Smith, Admr.,* 72 Ohio St., 1, at page 17, 73 N. E., 1051:

''Those cases establish the rule that conflicting provisions of a will should be reconciled so as to conform to the manifest general intent, and it is only in cases where such provisions are wholly and absolutely repugnant that either should be rejected. And where, by one clause in a will, property is devised or bequeathed, by words *prima facie* importing an absolute estate, and by subsequent clause is given in remainder to another person, the first devisee or legatee takes only a life estate, and the limitation over is valid. Giving effect to this principle the general intent and paramount purpose of the will can be easily carried out.''

So, we conclude that, under this will, a vested estate in the remainder of this bequest was created.

Effie Erman died on July 15, 1951, and shortly thereafter (July 23, 1951) the beneficiaries of the trust estate created by Joseph Erman's will notified the executor of Effie Erman's estate of their claim to any remainder of the $12,500 bequest that might be found. Shortly after her death, the executors, accompanied by a representative of the Tax Commissioner, opened her safe deposit box, chiefly for the purpose of discovering assets

subject to the inheritance tax. No taxable property was found. No evidence indicating to them at the time what had become of the bequest was noticed. An inventory of her estate was filed by her executors, but no mention was made of an asset in their hands belonging to the Joseph Erman estate. All the assets were listed as the property of the estate of Effie Erman. No exceptions were filed to the inventory, and, after notice and hearing, it was approved. Among the assets inventoried were the following corporate stocks:

  120 shares Douglas Aircraft Co., common stock
   72 "  United  "   "   "   "
    6 "   "   "   " 5% pfd. "
  218  "  Timken Detroit Axle Co., common stock.

 It was recited in the inventory that these stocks were held in a so-called street name at Benjamin D. Bartlett & Company.

 James M. Levy, Robert P. Goldman, and Robert Erman were and are trustees under the will of Joseph Erman, deceased, and executors under the will of Effie Erman, deceased, and Robert J. Erman is one of the beneficiaries under the will of Joseph Erman, deceased. Sometime prior to January 14, 1953, the executors of the estate of Effie Erman, deceased, having no further use for her safe deposit box, concluded to surrender it. Before doing so, they agreed to go to the box to remove its contents, destroy all matters of no value, and preserve such as seemed to have some value, evidentiary or otherwise. Robert J. Erman was unable to attend the opening of the box. When Levy and Goldman opened it, on January 14, 1953, and proceeded to sort the papers in the box, they discovered three written documents which they thought might have some evidentiary value and, for that reason, preserved them. These documents show that Effie Erman, on the same day that she receipted for $12,500 from the executors of Joseph Erman's estate, deposited $12,000 to her credit in the First National Bank in a special account, the balance in which was $8.29 before the deposit of $12,000, and $500 to her credit in a so-called regular account, and that the first check she gave thereafter, and before any other deposit had been made in the special account, was dated January 7, 1936, payable to Ellis & Company, with the notation, "amount to be invested," thereon. These documents show that

Ellis & Company invested $5,137.50 in North American Bond Trust Certificates, and the balance of $4,862.50 was sent to Benjamin D. Bartlett & Company to be used to open an account with that stock brokerage institution.

The records of Benjamin D. Bartlett & Company show that on January 9, 1936, it opened an account with Effie Erman, debiting itself with $4,862.50, and on the following day credited itself with having purchased for Effie Erman the following stocks:

```
100 Shares of United Airlines, stock at cost of $1,847.50
 50   "      "      "    Aircraft   "    "    "    "   1,459.65
 50   "      " Douglas   "         "    "    "    "   2,844.50.
```

And at the close of that day Effie Erman had to her credit those stocks and owed Bartlett & Company $930.99. And at that time these stocks belonged to Effie Erman, subject to the lien of $930.99, and had she died at that time the estate of Joseph Erman, without question, would have been entitled to them under the terms of his will. At the time Effie Erman bought the stocks she and Benj. D. Bartlett & Company entered into a standard agreement which contemplated the possibility of a succession of stock-brokerage transactions, and, among other things, made their transactions subject to the rules of the applicable stock exchange and authorized Benj. D. Bartlett & Company to carry her stocks in its name in its loan account when, if, and as long as, she was indebted, commingled with stock of other customers. The question is whether, during the intervening years, those stocks had become so intermingled with the general mass of Effie Erman's property, that they have lost their identity.

The identity of names between some of the stocks purchased by Bartlett & Company on January 10, 1936, and the stocks found in the inventory of Effie Erman's estate certainly is significant. But there must be an unbroken chain connecting the two. Does the record produce that chain?

From January 10, 1936, to September 13, 1939, the record shows clearly that no purchases or sales were made, excepting the purchase of 33 shares of United Airlines stock under preemption rights given to stockholders, and that the cost was added to the indebtedness due from Effie Erman to Benj. D. Bartlett & Company.

On September 13, 1939, the 133 shares of United Airlines stock were sold for $1,419.32, and on the same day 100 shares of Timken Detroit Axle stock were purchased for $1,726.50. The difference between the two sums was added to the indebtedness of Effie Erman.

This account continued without any accretion until May 28, 1940, at which time it was charged with a debt of $1,647.66. On that date, however, Effie Erman delivered certificates for 1,610 shares of stock in eight well-known corporations, and increased her indebtedness to $29,444.19 to Bartlett & Company. From then on, during the lifetime of Effie Erman, her account was more active, but the record discloses no transaction affecting the stock which she owned at the beginning of May 28, 1940, and at all times the indebtedness was amply secured by the stock, even without recourse to the United Aircraft, the Douglas Aircraft, or the Timken Detroit Axle stock. That was the state of the record at Effie Erman's death. After her death, her executors liquidated her account by selling all the stock excepting the Douglas Aircraft stock, and, after paying all indebtedness, they received in cash $21,949.38, and the Douglas Aircraft stock. At Effie Erman's death, she was indebted to Bartlett & Company in the sum of $5,436.30. The Timken Detroit Axle and United Aircraft stocks sold for $6,836.26.

So we find that the record clearly traces these stocks from the time of their purchase with the $4,862.50, which formed a part of the bequest of $12,500 under Item V of Joseph Erman's will, and, while their form changed by reason of stock dividends, and the exchange of the United Airlines for Timken Detroit Axle stock, their identity is unmistakable.

It is, perhaps, conceded that this fund is traceable upon the books of Bartlett & Company but, it is contended that that is not enough. It is said that Bartlett & Company did not have these stocks and, therefore, the entries in their books could not be applied to any subject—that the book entries simply show that Bartlett & Company was bound by contract to deliver stock of the specified description. That is not all the evidence in this record. The record shows that Bartlett & Company did buy the stock, and that at her death it was in the possession of Bartlett & Company's New York correspondent, commingled with other

stock of Bartlett & Company and its customers, pledged to secure a debt of Bartlett & Company, and that this was all done in accordance with the terms of the contract entered into between Bartlett & Company and Effie Erman at the inception of their relationship.

However, if the hypothesis of the defendants were correct, it would simply substitute the obligation of Bartlett & Company as the *res* of the trust, and, perhaps, affect the amount of recovery.

Section 82 of Restatement of the Law of Trusts states tersely: "Interests in intangible things, if transferable, can be held in trust." In the comment of the section, illustrations are given of a debt, a patent, a copyright, good will of a business, and a trademark being the subject matter of a trust.

In Section 83 of said Restatement, we find that "an equitable interest, if transferable, can be held in trust." Many illustrations are given in the comment. (See, also, 54 American Jurisprudence, 44, Section 32.)

The rule seems to be that if the property, whether tangible or intangible, absolute or contingent, is transferable, it may be made the subject matter of a trust.

So if the tracing of this fund stopped with the creation of a debt from Bartlett & Company to Effie Erman, we would hold that Effie Erman's estate would hold that debt in trust for the Joseph Erman trustees.

But the tracing of the mutation of that fund does not stop there. By the terms of item V, Joseph Erman clearly indicated that Effie Erman should have the power to invest the bequest so as to derive an income therefrom, which he contemplated she would consume, and that the estate following the life estates would, therefore, be limited to that part of the principal which remained at the termination of the life estates. We are, therefore, not concerned with tracing the income, and as Effie Erman had full power to use and dispose of the principal, we are not concerned with any wrongful disposal or commingling of the principal. We have traced $4,862.50 of the principal into the stock purchased by Bartlett & Company for Effie Erman, which they held for her at the time of her death, either in its original or converted form.

On the general subject of tracing trust funds into a commingled mass, it is said in 54 American Jurisprudence, 200, Section 256:

"In tracing trust property or funds into a commingled mass so that they are identified within the trust pursuit rule, the question of what may be such a commingled mass arises. It is clear that such a commingled mass subject to a trust or equitable lien for the trust property or funds within it, without further identification of such property or funds, may be a specific piece or parcel of property or a specific fund; in other words, tracing trust property or funds into a specific piece of property or a specific fund in which they have been commingled is sufficient identification of the trust property or funds to satisfy the trust pursuit rule. In the case of trust money, identification thereof within the trust pursuit rule is made where they are traced into a commingled mass of money in the pocket of the trustee or in a bag or chest."

And, at page 207, Section 263, of the same volume, on the subject of commingling of funds or property of different trusts, we find it is said:

"Where a trustee of different trusts commingles the properties or funds of the several trusts, restitution will be made to the innocent beneficiaries in proportion to the commingling, in so far as possible, out of the trust in which the properties and funds of the other trusts have been commingled, or out of the property, funds, or accounts of the trustee in which the trusts have been commingled, * * *"

We conclude, therefore, that of the $12,500 bequest in item V of the will of Joseph Erman, deceased, there remains the stocks purchased by Bartlett & Company with the $4,862.50, paid to it by Effie Erman, and that the executors of her estate received said stock in trust for the trustees of Joseph Erman's estate. And, of course, the ownership of the stock would carry with it all dividends paid thereon after Effie Erman's death.

But the defendants contend that, even assuming the trustees of Joseph Erman's estate owned these stocks at Effie Erman's death, they are now estopped from asserting that title That claim of estoppel is based on a letter signed by the beneficiaries of the trust created by item V of Joseph Erman's will,

and addressed to James M. Levy, Robert P. Goldman, and Robert J. Erman, as trustees under the last will and testament of Joseph Erman, deceased, and as executors under the last will and testament of Effie Erman, deceased. It is dated December 1952, without the specific day of the month being stated. This letter is as follows:

"This is to advise you that we have fully investigated the matter and are hereby relinquishing all claims against the estate of Effie Erman for all or any part of the $12,500 bequest left to Effie Erman under item V of the last will and testament of Joseph Erman, and are satisfied to have you make final distribution without retaining any sum for the purpose of any such possible claim."

The letter was prepared by Mr. Goldman and mailed to Robert J. Erman, accompanied by a letter dated December 3, 1952, stating that their signatures were desired thereto before the executors of Effie Erman's estate made distribution. Of course, the fact that there was a possibility of tracing some of the assets in their possession back to the bequest in item V of the will of Joseph Erman was recognized by Effie Erman's estate from the beginning of their administration, but, apparently, by December 1952 all the parties had concluded that all identity had been lost.

Upon receipt of the letter of December 1952, the executors of Effie Erman's estate obtained an order to distribute in kind certain stocks, including Douglas Aircraft, and, in accordance therewith, distributed 40 shares to Robert J. Erman, 40 shares to Richard Erman, and 40 shares to William Erman, beneficiaries under Effie Erman's will.

It was not until January 4, 1953, when the executors of Effie Erman's estate entered the box and discovered the documents by which $4,862.50 of the $12,500 bequest was traced to Effie Erman's account with Bartlett & Company and the beneficiaries of Joseph Erman's estate were notified thereof, that they were able to and did lay claim to the stocks bought with the $4,862.50 paid Bartlett & Company by Effie Erman. The beneficiaries under the will of Effie Erman were notified almost at once, and at a time when they still had the Douglas Aircraft stock, and had not changed their position in any respect. That

claim was, in effect, if not in express words, a disavowal of the December 1952 letter to the extent that they had the power to do so.

At the time the Joseph Erman beneficiaries withdrew their consent, the executors still had to their credit $10,729.90, and still have that amount, undistributed and subject, presumably, to all lawful claims against the estate.

There is no doubt that, while the letter of December 1952 had not been withdrawn, any action taken by the executors and beneficiaries of Effie Erman's estate in reliance thereon, is binding upon and a complete bar to the assertion of any claim that contradicts the representations and consents therein contained. We are concerned here with the question of revocability of the letter and the effect of its revocability.

We have learned from counsel and from the trial court's opinion that the plaintiffs were denied relief on the ground that by the letter of December 1952 they were estopped to assert any claim they might have. The language of the letter is that of relinquishment of right and consent that any possible right might be disregarded. As no present consideration was paid, its binding quality as a contract or release would depend upon subsequent conduct by the parties to whom it was addressed. So, whether it be regarded as a release, a waiver, or an estoppel, the element of obligation would have to be supplied by proof of conduct thereafter in reliance thereon. The subject is treated in the law books under all three headings.

In *Frith* v. *Siler*, 32 Ga., 665, the case involved the identity of a horse, which the plaintiff claimed had been stolen from him. There was evidence that he had identified the horse as his on one occasion, and on another occasion stated that the same horse was not the stolen horse, but the evidence left in doubt the order in which the two incidents occurred. There was evidence that the defendant knew of both statements. The syllabus which clearly states and applies the law is as follows:

"1. So long as no one is injured by it, a party who has disclaimed the ownership of property may retract the disclaimer and assert his title.

"2. If a party who has once disclaimed the ownership of property, afterward asserts his title, and warns another not to

buy it, and the latter, with a knowledge that the assertion of title, and warning were subsequent to the disclaimer, buys the property, he acts in his own wrong.

"3. If, on the other hand, the disclaimer, after an inspection of the property, was subsequent to the assertion of title, and the warning not to buy, and the purchaser was so informed, he was justified in disregarding the warning."

See, also, *Sanitary District of Chicago* v. *Cook,* 169 Ill., 184, 48 N. E., 461, 61 Am. St. Rep., 161, 39 L. R. A., 369.

In 31 Corpus Juris Secundum, 300, Section 86, it is stated in the text: "One who has denied owning certain property may afterward retract such disclaimer, provided no one is injured thereby."

Our conclusion is that to the extent, and only to the extent, that the executors and beneficiaries of the will of Effie Erman, deceased, relied and acted upon the letter of December 1952, prior to its revocation, are the beneficiaries under the will of Joseph Erman, deceased, estopped from asserting their title to the remainder of the bequest under item V of said will; that the proceeds of the sale of the 100 shares of United Aircraft and Timken Detroit Axle stock have been traced to the fund now in the hands of the executors of the estate of Effie Erman, deceased, to which the trustees of the estate of Joseph Erman are entitled to the extent of such proceeds, and to that portion of the Timken Detroit Axle stock paid for by the proceeds of the sale of the 100 shares of United Airlines stock and the difference between the pre-emptive price and the market price for the 33 shares.

We also find that Richard Erman and William Erman were informed of the revocation of the December 1952 letter before either of them had changed his position, and, therefore, hold the Douglas Aircraft stock, received from the executors of the estate of Effie Erman, in trust for the trustees of Joseph Erman's estate.

A decree may be presented in conformity to this opinion.

*Judgment accordingly.*

Ross, P. J., and HILDEBRANT, J., concur.