Mary E. BISHOP, Widow, Individually, etc., et al., Appellants,

v.

Ottis Ross BISHOP, Jr., et al., Appellees.

Court of Appeals of Kentucky.

March 11, 1960.

As Modified on Denial of Rehearing March 24, 1961.

588

Ben B. Hardy, Hardy & Hardy, S. W. Kellerman, Jr., Louisville, for appellants.

Uhel O. Barrickman, Richardson, Barrickman & Dickinson, Shelly T. Riherd, Glasgow, for appellees.

PALMORE, Judge.

This is a controversy between two sets of children of the late Taylor L. Bishop as to the ownership of the 162-acre "Oil City" farm on which he resided until his death in 1956. The chancellor found in favor of the plaintiffs, children by the first wife.

Prior to the first World War the decedent, Taylor Bishop, owned two tracts of land in Barren County, known as the Oil City Farm (162 acres) and the Red Cross Farm (82 acres). In 1911 and 1912, being in financial straits, he obtained some money from his father-in-law, as an incident to which he conveyed the two places to his wife, Retta Bishop (mother of the appellees). Whether as between the husband and wife they were intended as mortgages is a matter of speculation. At any rate, in the many years that followed, during which time Taylor Bishop recognized that the legal title was vested in Retta Bishop's heirs, he never availed himself of the opportunity to assert such a theory by timely litigation.

Retta Bishop died intestate in 1921 following an illness of some five years. On September 19, 1919, she had reconveyed to her husband an undivided one-half interest in the Oil City Farm and on November 17, 1919, had reconveyed the Red Cross Farm to him. Both deeds were recorded immediately after execution, but under Sec. 506 of the Kentucky Statutes (eventually repealed in 1942) a wife could not execute a conveyance unless the husband joined or had theretofore executed his conveyance of the property, and it was later held that this inhibition applied to a conveyance from wife to husband. Hall v. Hall, 1930, 236 Ky. 42, 32 S.W.2d 536; Hensley v. Lewis, 1939, 278 Ky. 510, 128 S.W.2d 917, 123 A.L.R. 537, and Howard v. Turner, 1941, 287 Ky. 206, 152 S.W.2d 589, 590 (wherein it was said that, "it is the well known law in this state that an attempted conveyance from a married woman to her husband, or to anyone else, in which the husband does not join as grantor, is absolutely void and passes no rights or titles to the purported grantee. This law is too well known to the legal profession to require citation of authority."). That had been the recognized rule prior to the Weissinger Act of 1894. Vicroy v. Vicroy, 1898, 45 S.W. 75, 20 Ky. Law Rep. 47; Doty v. Cox, 1893, 22 S.W. 321, 15 Ky.Law Rep. 68; Sayers v. Coleman, 1872, 5 Ky.Op. 733. Taylor Bishop

evidently was advised very soon after his wife's death that the two deeds from her were invalid.

Through the years from the death of Retta Bishop in 1921 until his own demise in 1956 Taylor Bishop continued to reside on the Oil City place. In 1925 he married the appellant Mary Bishop, and they raised their children there. Meanwhile, the children of the first marriage resided there also until they married and established separate homes, and one of them, Marchel Bishop, lived there and had the actual charge and management of the farm from 1924 until he went into military service in 1942. Taylor Bishop evidently was not physically able to do the rougher work of farm life, and it was through the active help and management of Marchel Bishop and others of the older set of children that a living from the land for the younger set of children was provided. During all of this time (at least until the latter days of his life) Taylor Bishop recognized that the deeds executed by his first wife in 1919 were void and that he had only a "lifetime dower" interest in the property. He freely said so, both to the children, to neighbors, and to other disinterested persons. According to two of the witnesses he made such statements as late as four years and two years prior to his death. It was quite clearly understood in the family all along that the older set of children claimed the title to the property, subject only to their father's curtesy interest. That he himself regarded that claim as valid is shown not only by the appellees' witnesses but also by the following facts:

(1) In 1939 a suit was filed against Taylor Bishop on a note. A general order of attachment was levied on the two farms. By answer Mr. Bishop pleaded, inter alia, that he had only a "homestead right" in the lands, which was exempt from levy. By separate intervening answer (filed by the same counsel representing their father) the children of the first wife (appellees herein) pleaded that they were the owners of the property by inheritance from their mother.

(2) On January 30, 1942, Marchel Bishop and Mead Bishop, two of the first set of children, paid and settled the claim pending by virtue of the 1939 lawsuit (there is evidence, however, that it was really their debt), and on the following day, January 31, 1942, the first set of children, with their respective spouses, conveyed the Red Cross Farm to their father. The deed recited that title was acquired by the grantors as the only heirs of their mother, Retta Bishop, who had obtained it by deed from Taylor Bishop in 1912. There is no evidence of any explicit agreement that this conveyance was in consummation of a "settlement," for the simple reason that there was no dispute to settle. But it is clear that the old man brought up the fact that he didn't have anything and suggested that they deed him the Red Cross place so that he would have something for his wife and the younger children. Without delay or demur the older children acceded to his wish, and soon thereafter Mr. Bishop conveyed the Red Cross Farm to his wife, the appellant Mary Bishop.

(3) On two or more occasions payments received for pipe line easements were divided equally among Mr. Bishop and the older set of children, the father taking a "child's part," which at least twice was paid to him in the form of checks from Marchel Bishop.

(4) The will of Taylor Bishop, executed October 22, 1949, left to the widow, Mary Bishop, "all of the personal property I may own at the time of my death, including all livestock, farm machinery, growing crops, cash and notes on land and all other personal property of every kind and description," but makes no mention whatever of any real estate.

In the belief that they were the owners of the property the first set of children over a long period of years paid taxes, constructed a barn, rebuilt a porch and

painted the dwelling house, graded and gravelled the road into the Oil City place, and in general saw that it was kept up. In some of this work, however, one or more of the younger set of children pitched in and helped. When money was paid out for those purposes it was customary for either Mead or Marchel Bishop to handle the transaction and collect from his brothers and sisters their proportionate shares. Exhibits filed in the record show Marchel Bishop paying the taxes as late as 1952, though the bills for 1953, 1954, and 1955 evidently were paid by Taylor Bishop himself.

In the case of Smith v. Hughes, 292 Ky. 723, 167 S.W.2d 847, decided on February 6, 1942 (rehearing denied December 18, 1942), this Court overruled the earlier decisions holding that a wife could not convey directly to her husband (necessarily including Howard v. Turner, supra, decided the year before) and upheld such a conveyance made in 1900. Two subsequent decisions, Moore v. Terry, 1943, 293 Ky. 727, 170 S.W.2d 29, and May v. May, 1949, 311 Ky. 74, 223 S.W.2d 362, ignored Smith v. Hughes and gave recognition to the old rule, and then in Cooper v. Cooper, Ky. 1952, 248 S.W.2d 702, Smith v. Hughes was followed. This situation was finally resolved by Nickel v. Gregory, Ky.1953, 256 S.W.2d 517, decided in accordance with Smith v. Hughes.

Some time during this interregnum between Smith v. Hughes, 1942, and Nickel v. Gregory, 1953, Taylor Bishop and his wife, Mary, visited an attorney and were advised that the deeds from Retta Bishop in 1919 were good, and from that time on the old man may have had some misgiving about the common understanding they had all shared theretofore with respect to the title to the Oil City Farm. However, he did not so express himself to the children. On the contrary, it is clear that to their face, as well as to others, he continued overtly to recognize their title. Mrs. Bishop herself said: "Well, he might have agreed at times with them [the first chil-

dren] but he told me different *when they left,*" (emphasis added).

Under the foregoing circumstances the trial court upheld the claim of the first set of children under two theories, (a) that they had established title by adverse possession and (b) that the transaction of January 31, 1942, in which they conveyed the Red Cross Farm to their father amounted to a purchase or settlement of any claim which the father might have had to the Oil City Farm. However, we do not find it necessary to analyze either of these propositions, because it is our opinion that the enforcement of the legal title asserted by the appellants is barred by equitable estoppel, which was specifically pleaded by the appellees.

The facts of this case bring it within the precedent of Jenkins v. Taylor, 1900, 59 S.W. 853, 22 Ky.Law Rep. 1137, and Taylor v. Jenkins, 1901, 65 S.W. 601, 23 Ky.Law Rep. 1574, where a partition deed covering 157 acres of land owned by an ancestor at his death was drawn in favor of one of the heirs and her husband. After the death of the heir her daughter and only child discovered that the conveyance had been made to her mother and father jointly, and she proposed to have it reformed on the ground of mistake. But the father, agreeing that a mistake had been made, assured her that he claimed only a right of curtesy, that upon his death she would have the full title, and that there was no use in taking legal steps to correct the deed. Apparently this was an honest belief on his part, and during the remainder of his life he reasserted it both to the daughter and to others. He continued in possession, remarried, and had children by the second marriage. Following his death the widow and her children contested the claim of the daughter by the first marriage. It was held, however, that the acts and declarations of the father, having been relied on by the daughter, worked an equitable estoppel and prevented assertion of the legal title, notwithstanding a plea of limitation.

 Neither Taylor v. Jenkins nor the instant case neatly fits the technical requirements of equitable estoppel as enumerated in Jones v. Travis, 1946, 302 Ky. 367, 194 S.W.2d 841. Nothing was consciously concealed. On the contrary, the parties in good faith acted for many years on what developed to be a mutual mistake of law, though if they had not been lulled into inaction, and had litigated the matter at any time during the 20 years ending in 1941, their conception of the law would have been upheld. It became a retroactive misconception with Smith v. Hughes, supra. Though fraud is said to be the true basis of equitable estoppel, it may be a constructive fraud, a fraud "not in the intention of the party, but in the effect of his conduct." 19 Am.Jur. 750, 751 (Estoppel, Sec. 93), quoting from Den ex dem. Richman v. Baldwin, 1848, 21 N.J.L. 395, as noted in 50 A.L.R. 686. There was no wrongful intention at any time on the part of Taylor Bishop. Had he stood silently by, in ignorance of his true rights, and permitted the appellees to make improvements he (and, through him, the heirs by the second wife) would not be estopped to assert his title upon learning the error. 19 Am.Jur. 789 (Estoppel, Sec. 133). But unlike Jones v. Travis, supra, and Coleman v. Republic Steel Corp., Ky.1955, 280 S.W.2d 171, this is not a case of mere silence. In one way or another, for over 30 years following Retta Bishop's death in 1921 Taylor Bishop said to her children, "This is your property. I have only a curtesy interest. When I die it will be yours entirely." On January 31, 1942, relying on that understanding, they deeded him the Red Cross Farm. Though appellants may say that nothing passed by that deed, because Taylor Bishop really owned the property anyway, it cannot be disputed that the appellees divested themselves of a bona fide claim which, though unfounded, would have been sufficient consideration for a settlement had there been a dispute. Cf. Cook v. Cook, Ky.1957, 299 S.W.2d 261; 12 Am. Jur. 577 (Contracts, § 82). Should the law be different because in fact no one was threatening to sue, because they were in civilized harmony? In this case at least, we think not.

 Its proper function in the organic growth of the law moves every court of last resort from time to time to throw off the confining shell of a principle that has become an eccentric anachronism. This was done in Smith v. Hughes, supra, but the opinion was not limited to a prospective effect, as were the opinions in such cases as Payne v. City of Covington, 1938, 276 Ky. 380, 123 S.W.2d 1045, 122 A.L.R. 321, and Hanks v. McDanell, 1948, 307 Ky. 243, 210 S.W.2d 784, 17 A.L.R.2d 1, wherein the preservation of property rights acquired under overruled opinions was recognized as a requirement of justice. See Grinnell, Judicial Regulation of Stare Decisis—An Opportunity for the Courts and the American Law Institute, 24 Journal of the American Judicature Society 150. This lawsuit would never have occurred except for the change in property rights effected in 1942 by Smith v. Hughes. The same dictates of justice which led this court to limit the Payne and Hanks opinions to a prospective effect should, it seems, require it to preserve rights acquired prior to Smith v. Hughes if there is a substantial showing that, beyond the bare vesting or divesting of the right, the parties have taken or refrained from acts of legal consequence in reliance on the law as it existed before and a contrary result would be clearly unconscionable. All of this has been strongly shown in this case, and even if it be conceded that some of the "tickets and tags" marking the precise identification of estoppel in pais were somehow lacking, we should not allow obvious justice to be defeated by narrow legal conceptualism. Rights must not be gained or lost on the decisions of court as money is won or lost on the rise and fall of the grain market.

It is our opinion that the trial court entered the only judgment authorized under the pleadings and evidence before him, and it is affirmed.