Jerry MAGGARD and Kathy Maggard, his wife, Appellants,

v.

Charles H. McKELVEY, Appellee.

Court of Appeals of Kentucky.

Oct. 30, 1981.

Discretionary Review Denied
Feb. 9, 1982.

Charles A. Hagan, Hartford, for appellants.

Byron Lee Hobgood, Madisonville, for appellee.

Before HOGGE, HOWARD and McDONALD, JJ.

McDONALD, Judge:

The appellants, Jerry and Kathy Maggard, claim damages in tort against the appellee, Charles H. McKelvey, their physician, for the birth of an "unwanted" child.

The appellants sued the physician alleging negligence in the performance of a bilateral vasectomy upon Jerry. The complaint stated, "Had the vasectomy been performed in a careful and skillful manner, which defendant failed to do, the plaintiff, Kathy Maggard, would not have become pregnant." The infant born on September 9, 1979, as a result of the alleged negligence of Dr. McKelvey, was named Chad. Kathy had a normal pregnancy and Chad is a normal and healthy child.

In paragraph thirteen of the appellants' complaint they demand damages for the unwanted child as follows:

As a further proximate result of the negligence of the defendant and the birth of a child thereafter; plaintiffs Jerry Maggard and Kathy Maggard, incurred and in the future will incur expenses for the care and maintenance of said child, all to their damage of One Hundred and Thirty Thousand Dollars, ($130,000).

The facts giving rise to this cause of action show that Jerry and Kathy Maggard were the parents of two normal and healthy children and had decided to limit their family to the two children already in being. Consequently, Kathy had been taking oral contraceptives since 1974. Kathy suffered from headaches and she and Jerry believed the oral contraceptives caused or contributed to her condition. They decided Jerry would undergo a vasectomy to enable Kathy to cease taking oral contraceptives without risking pregnancy. Jerry, aged 26, engaged Dr. McKelvey, an Owensboro urologist, to perform the operation.

By deposition Jerry testified that he consulted Dr. McKelvey explaining what he and his wife desired. According to Jerry, the doctor claimed he could take care of the problem.

Dr. McKelvey discussed the procedure with both Jerry and Kathy, explaining that the operation was not a 100 percent guarantee of sterility. He had them read and sign the following form:

## "VASECTOMY" GENERAL INFORMATION

Vasectomy is an operation done on the scrotum consisting of the excision of a small piece of each of the sperm tubes which run from the testicles to the prostate. The ends of the tubes are doubly tied and this prevents sperm from going from the testicles to the prostate and thus outside. The operation has been done for a number of years to prevent infection in the testicles as well as to cause sterility which is the inability to father children.

\* \* \* \* \* \*

As in any operation technical factors can cause a failure of the operation with the resultant patient still being fertile. Also, sperm are normally stored beyond the area of the operation for a period of six to eight weeks during which time the man is fertile. A semen examination for sperm is routinely done at six weeks and six months following the operation to see if any sperm remain. Even with this, however, the operation is not a guarantee of sterility. Since the operation only interrupts the sperm passages and has nothing to do with hormones, it should not affect the man's sexual capabilities and activities which are often psychologically influenced.

## CONSENT FOR BILATERAL VASECTOMY

This is to certify that we, (HUSBAND) (signed) Jerry Maggard, Sr., and (WIFE) (signed) Kathy Maggard, have read the above about the sterilization procedure, BILATERAL VASECTOMY. Furthermore, we understand that this operation can have serious complications and that it is not always 100% effective. We have also been advised that we will need periodic examination of the semen afterwards to see if sperm are present.

(Signed)  Jerry Maggard Sr.
HUSBAND'S SIGNATURE
(Signed) I have read, understand, agreed to the above.
(Signed)  Kathy Maggard
WIFE'S SIGNATURE
(Signed) I have read, understand & agree to the above.
WITNESS:
(Signed)  Sharon Leet
DATE: (Signed)  4–26–78

On May 11, 1978, the vasectomy was performed at the Owensboro-Daviess County Hospital. Postoperatively, Jerry kept three to four appointments with Dr. McKelvey for semen tests. Jerry contended that Dr. McKelvey advised him that his wife could stop taking the oral contraceptives. This was denied by Dr. McKelvey.

Dr. McKelvey was deposed and testified that the last time he saw Jerry he gave him another semen sample bottle to be returned to the office for testing at a future appointment, and that Jerry failed to keep the last appointment. Jerry admitted receiving the semen sample bottle and failing to keep his last appointment.

Kathy, relying upon assurances from Jerry about his sterility, ceased taking the oral contraceptives. On February 12, 1979, another physician advised Kathy she was pregnant.

On January 30, 1980, suit was filed. Subsequently, the trial court, by partial summary judgment, dismissed the appellants' claim in paragraph thirteen of the complaint on the grounds that they had sustained no damages in a legal sense. Then, on December 15, 1980, a final summary judgment was entered dismissing the appellants' entire complaint.

The appellants present two arguments.
1. THE TRIAL COURT ERRED IN DISMISSING THAT PORTION OF THE APPELLANTS' COMPLAINT CLAIMING DAMAGES FOR THE EXPENSE OF REARING AN "UNWANTED" CHILD, BORN TO THEM AFTER THE

APPELLEE PERFORMED A VASECTOMY UPON APPELLANT, JERRY MAGGARD.

Here, the appellants pled medical negligence and damages resulting from such negligence. No contract theory was pled and we, on appeal, are confined to addressing the issue of damages in tort only. Mention has been made in the briefs that the damages would be the same. However, there is a difference and the language found in the almost ancient case of *Ky. Heating Co. v. Hood*, 133 Ky. 383, 118 S.W. 337 (1909), eloquently explains the difference as follows:

> In actions for breach of contracts the rule generally held to is that only such damages can be recovered as are actually sustained, or such as it is reasonable to conclude were within the contemplation of the parties at the time the contract was entered into. [Citation] But this measure that obtains in contracts will not be applied in actions sounding in tort. There is a wide difference between the rights and remedies allowable in the one case and in the other. [Citation] It is the wrongful act done, and the consequences that naturally result from it, that the law looks at and holds the wrongdoer responsible for. A person who commits a tort like this is liable for all the damages that naturally flow from, and are the result of, this wrongful act, although he may not at the time have given any thought to or have anticipated that injurious consequences would follow.

The primary issue before us in this argument, assuming there is negligence, is whether a physician must respond in damages for the cost of rearing a healthy but unwanted child.

In *Hackworth v. Hart*, Ky., 474 S.W.2d 377 (1971), our highest court established precedent for the proposition that the issue of damages resulting from a negligently performed vasectomy presented a jury question. However, in *Hackworth, supra*, the propriety of awarding damages for the cost of rearing an unwanted child was not addressed.

A growing number of jurisdictions recognize the expense of rearing a healthy but unwanted child as tort damages, thereby permitting the cost to be submitted to a jury for assessment. A complete review of this subject is found in 83 A.L.R.3d 15, "Tort Liability For Wrongful Birth."

We ask whether these damages come within the bounds of consequential damages for the negligent conduct of a physician. To answer negatively would defy logic and be contrary to the concept of causation in tort as articulated by our Supreme Court. *Ky. Heating Co., supra*, tells us that a tortfeasor is responsible for all damages that naturally flow from a wrongful act, and for those damages that might reasonably have been expected to follow from the circumstances according to common experience and the usual course of events that might have been reasonably anticipated.

Further, in *Deutsch v. Shein*, Ky., 597 S.W.2d 141 (1980), our Supreme Court, in discussing whether negligence was a substantial factor in causing harm, said,

> Our use of the substantial factor test in fashioning instructions in prior cases shows the test applies to the event which results in the injury, not the injury itself [situations and cases cited]. The injury need only flow directly from the event.

Given this clear guidance it would be illogical for us to say that the damages claimed were not within the "foreseeability of the injury," "orbit of risk," or "zone of danger." *See Deutsch, supra.*

However, these concepts do not set the outer limits on tort damages. The final hurdle to be jumped is that of public policy. It is here that we think the appellants have tripped.

We view sanctioning such an expansion of a physician's liability to be a question of public policy. *Hanks v. McDanell*, 307 Ky. 243, 210 S.W.2d 784 (1948) explains,

> 'Public Policy' is the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like; it is

that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men having due regard to all the circumstances of each particular relation and situation.

Common sense tells us that it is in society's best interests to hold physicians to a standard of professional competence and impose liability when they are negligent in treating their patients. But to hold a doctor responsible for the support of a mistakenly conceived child takes him well beyond the scope of his duty to his patient, as commonly thought of by both the lay public and the medical profession. Public policy can, and in this instance does, cut off the legal responsibility of the physician, even though he may have been negligent and the injured be innocent. Without a clear expression of public opinion, some indication from the legislature or an interpretation by our Supreme Court to the contrary, we conclude that our public policy prohibits the extension of liability to include these damages. *See Deutsch, supra.*

█ Accordingly, we hold that the damages are limited to the general and special damages incidental to the pregnancy and birth, such as, pain and suffering, loss of consortium, medical and hospital expenses, and loss of wages.

2. APPELLANTS CONTEND THAT THE SUMMARY JUDGMENT DISMISSING THE TOTAL ACTION WAS CONTRARY TO LAW BECAUSE THERE EXISTED GENUINE QUESTIONS OF FACT.

On this point we must agree with the appellants and reverse the trial court.

The previously mentioned "Vasectomy General Information" form states that there would be excision of a small piece of each of the sperm tubes. The hospital record noted, "Patient underwent bilateral vasectomy and one of the segments was lost by the laboratory personnel and only one segment of vas was sent for histologic examination." A further hospital note states, "Vas deferens—only one vas deferens presented.—Two vas sections not presented."

When the appellee filed his motion for summary judgment it was supported by the affidavits of two physicians. One swore that he examined the hospital records, Dr. McKelvey's notes, and various exhibits. The last paragraph of this physician's affidavit said,

It is my professional, medical opinion that Dr. McKelvey used that degree of care and skill expected of a reasonable, competent practitioner in the field of Urology, acting in the same or under similar circumstances in treating Mr. Jerry Maggard for a bilateral vasectomy.

The doctor's language is familiar. He evidently is well-versed in the opinion of *Blair v. Eblen,* Ky., 461 S.W.2d 370 (1970), because he parrots the jury instruction suggested in that case.

In response to the appellee's motion for summary judgment, the appellants submitted a memorandum and the affidavit of Dr. Orrahood, the pathologist who examined the tissue fragments from Jerry's operation. He stated that the usual procedure called for submission of two fragments of vas deferens, without supportive tissue, but that of the two fragments he received, one was vas and the other was not.

Dr. Orrahood was heard from again, this time by a subsequent affidavit filed in support of the appellee's motion, in which he opined that there could be many explanations for the lack of two fragments of vas, and therefore, medical negligence should not be inferred from that occurrence. The court granted the appellee's motion based on its review of the pleadings, affidavits and entire record.

█ A court confronted with a motion for summary judgment must address the two-pronged question of whether there exist any genuine issues of material fact and whether the movant is entitled to judgment as a matter of law. In so doing, the court draws all inferences in favor of the non-movant. The summary judgment procedure should not be used as a means of determining questions of fact; rather, it operates as a preliminary test to discover

whether there exist any factual issues for determination.

 We are aware that expert testimony is necessary to establish negligence in medical malpractice cases, unless the negligence was so apparent that laymen with general knowledge would have no difficulty in recognizing it. *See Harmon v. Rust*, Ky., 420 S.W.2d 563 (1967), *Jarboe v. Harting*, Ky., 397 S.W.2d 775 (1965), and *Johnson v. Vaughn*, Ky., 370 S.W.2d 591 (1963). We believe this case comes within the expert testimony requirement rule.

The appellee argues that there was no expert medical evidence contradicting the urologist's or pathologist's affidavits. We disagree. Construing the affidavit of the pathologist (submitted for the appellants) in the strongest favorable light, as we must, we find it supports the inference that only one segment of vas was excised, raising the question of medical negligence. This is sufficient to withstand the appellee's motion.

Our examination of the record shows that the case was pending less than a year when dismissed. It was actively and vigorously practiced on both sides. Suddenly, the appellants were required to ward off a summary judgment based on affidavit testimony of two experts who claimed that, in their opinion, Dr. McKelvey did no wrong. Substantively, their opinion testimony amounted to no more than "cheerleading" for Dr. McKelvey.

For a trial court to accept the sworn opinions of the appellee's experts as conclusive on the issue of negligence amounts to trying the case by affidavit. The question of negligence, professional or ordinary, belongs to the finder of fact, as does the credibility of witnesses, expert or lay. The appellants should not have lost their day in court.

We do not view this case as falling within our previous holding in *Singleton v. Bd. of Ed. of Harrodsburg*, Ky.App., 553 S.W.2d 848 (1977), a case in which no counter-affidavits had been filed. We think the principles applicable in ruling upon a summary judgment in a professional negligence case are controlled by *Roberson v. Lampton*, Ky., 516 S.W.2d 838 (1974), and *Ogden v. Employers Fire Insurance Company*, Ky., 503 S.W.2d 727 (1974). We conclude that the summary judgment was premature.

Thus, the trial court is affirmed in its summary judgment dismissing the claim for the cost of rearing an unwanted child, but the remainder of the action is remanded for further proceedings consistent with this opinion.

All concur.