**NATIONAL ASSOCIATION OF BROADCASTERS, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.***

**No. 75–1087.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 25, 1976.

Decided Dec. 16, 1976.

---

* Metromedia, Inc. (two cases), 75–1101, 02; American Telephone and Telegraph Co. (two cases), 75–1141, 42; Barnes Enterprises, Inc. (two cases), 75–1144, 45; Southern Broadcasting Co. (two cases), 75–1153, 54; U.S. Independent Telephone Association, 75–1155; National Telephone Cooperative Assoc. (two cases), 75–1162, 63; Bethany Broadcasting Co. (two cases), 75–1164, 65; Orion Broadcasting, Inc. (two cases), 75–1166, 1172; KWMT, Inc. (two cases), 75–1167, 73; KOTV, Inc. (two cases), 75–1168, 1175; Northwest Arkansas Broadcasting and Television Co. (two cases), 75–1169, 71; Able Communications of Calif., Inc. (two cases), 75–1170, 74; GTE Service Corp. (two cases), 75–1180, 81; Amaturo Group, Inc. (two cases), 75–1183, 84; Clay Broadcasting Corp. (two cases), 75–1185, 86; Capital Cities Communications, Inc. (two cases), 75–1189, 90; United System Service, Inc., 75–1262; Western Union Telegraph Co. (two cases), 75–1270, 71; Regency Broadcasting Corp., 75–1277; National Association of FM Broadcasters, 75–1278; Bahia de San Francisco (two cases), 75–1313, 1347; General Electric Broadcasting Co., Inc. (two cases), 75–1314, 45; American Broad-casting Companies, Inc. (two cases), 75–1315, 46; Constitution Plaza, Inc. (two cases), 75–1354, 55; Nationwide Communications, Inc. (two cases), 75–1356, 57; Wichita Falls Telecasters (two cases), 75–1405, 06; Artesia Broadcasting Co., Inc. (two cases), 75–1413, 14; Hearst Corp. (two cases), 75–1416, 17; Arizona Television Co. (two cases), 75–1418, 19; WHTN–TV, Inc., 75–1520; ITT World Communications, Inc., 75–1539; Combined Communications Corp., 75–1596; Greater Philadelphia Radio, Inc., 75–1597; State College Communications Corp., 75–1598; K(O) KUA Radio One Corp. (two cases), 75–1603, 04; Communications Satellite Corp. (two cases), 75–1637, 38; KDFW–TV, Inc. (two cases), 75–1672, 73; Oregon Broadcasting Co. (two cases), 75–1685, 86; Golden Circle Broadcasting Corp. (two cases), 75–1689, 90; Adler Broadcasting Corp. (two cases), 75–1746, 47; WLAC, Inc. (two cases), 75–1769, 70; Scripps-Howard Broadcasting Co. (two cases), 75–1771, 72; Aircraft Owners and Pilots Assoc., 75–1827; Westinghouse Broadcasting Co., Inc., 75–1834; and Western Union International, Inc. (two cases) v. Federal Communications Commission, 75–1846, 47.

Ernest W. Jennes, Washington, D. C., with whom Nicholas W. Fels, John B. Summers, Thomas J. Dougherty, Preston R. Padden, Joel Rosenbloom, John P. Bankson, Jr., Theodore D. Frank, Thomas Schattenfield, Louis Schwartz, Jack P. Blume, Alan Y. Naftalin and Frederick A. Walton, Jr., Washington, D. C., were on the brief for appellants-petitioners in Nos. 75–1087, 75–1088, 75–1101, 75–1102, 75–1164, 75–1165, 75–1166, 75–1167, 75–1168, 75–1169, 75–1170, 75–1171, 75–1172, 75–1173, 75–1174, 75–1175, 75–1183, 75–1184, 75–1189, 75–1190, 75–1277, 75–1278, 75–1356, 75–1357, 75–1405, 75–1406, 75–1416, 75–1417, 75–1418, 75–1419, 75–1597, 75–1598, 75–1672, 75–1673, 75–1685, 75–1686, 75–1769, 75–1770, 75–1771 and 75–1772 also argued for appellant-petitioner broadcast licensees.

Edgar F. Czarra, Jr., and Joseph Volpe, III, Washington, D. C., entered appearances for petitioners in Nos. 75–1166, 75–1167, 75–1168, 75–1169, 75–1170 and appellants in Nos. 75–1171, 75–1172, 75–1173, 75–1174 and 75–1175.

William J. Dempsey, Washington, D. C., entered an appearance for petitioner-appellant in Nos. 75–1416, 75–1417, petitioners-appellants in Nos. 75–1418 and 75–1419, appellants-petitioners in Nos. 75–1685 and 75–1686, appellant-petitioner in Nos. 75–1769, 75–1770, 75–1771 and 75–1772. Christopher J. Reynolds, Washington, D. C., entered an appearance for appellants-petitioners in Nos. 75–1685 and 75–1686, appellant-petitioner in Nos. 75–1769, 75–1770, 75–1771 and 75–1772.

Arthur G. House, Washington, D. C., entered an appearance for appellants-petitioners in Nos. 75–1356 and 75–1357.

Robert A. Woods and Lawrence M. Miller, Washington, D. C., entered appearances for petitioner in Nos. 75–1597 and 75–1598.

J. Roger Wollenberg, Washington, D. C., entered an appearance for appellants-petitioners in Nos. 75–1672 and 75–1673.

Horace P. Moulton, New York City, for petitioners-appellants in Nos. 75–1141 and 75–1142 et al., also argued for petitioner in No. 75–1155, appellant-petitioner in Nos. 75–1162 and 75–1163, appellant-petitioner in Nos. 75–1180 and 75–1181, petitioner in No. 75–1262, appellant-petitioner in Nos. 75–1270 and 75–1271, petitioners in No. 75–1539, appellant-petitioner in Nos. 75–1637 and 75–1638, petitioner in No. 75–1827 and appellant-petitioner in Nos. 75–1846 and 75–1847. Stephen N. Shulman, Stephen G. Wood, Washington, D. C., William D. Goddard, Eric L. Hirschhorn, F. Mark Garlinghouse and Alfred A. Green, New York City, were on the brief for petitioners-appellants in Nos. 75–1141 and 75–1142.

C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Robert B. Nicholson and Laurence K. Gustafson, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellee-respondents. Diana Lee Evans, Joseph A. Marino, Atty., F. C. C. and Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., also entered appearances for appellee-respondents.

John P. Southmayd, Ben C. Fisher, Grover C. Cooper, Martin R. Leader and Richard R. Zaragoza, Washington, D. C., were on the brief for petitioners-appellants in Nos. 75–1144 and 75–1145.

Norman E. Jorgensen, Beaverton, Or., was on the brief for petitioners-appellants in Nos. 75–1153 and 75–1154.

Thomas J. O'Reilly, Washington, D. C., was on the brief for petitioner in No. 75–1155.

David Cosson, Washington, D. C., was on the brief for appellant-petitioner in Nos. 75–1162 and 75–1163.

Allen R. Frischkorn, Jr., Ruth L. Prokop and William R. Malone, Washington, D. C., were on the brief for appellant-petitioner in Nos. 75–1180 and 75–1181.

Alan Y. Naftalin and Margot Smiley Humphrey, Washington, D. C., were on the brief for appellant-petitioner McGraw-Hill Broadcasting Co., Inc. in Nos. 75–1183 and 75–1184.

John M. Lothschuetz, Mansfield, Ohio, Carolyn C. Hill, Washington, D. C., and Warren E. Baker, Westwood, Kan., were on the brief for petitioner in No. 75–1262.

Joel Yohalem, Washington, D. C., was on the brief for appellant-petitioner in Nos. 75–1270 and 75–1271. Jack Werner and Laurence Singer, Washington, D. C., also entered appearances for appellant-petitioner in Nos. 75–1270 and 75–1271.

Erwin G. Krasnow and Michael O. Wise, Washington, D. C., were on the brief for appellant-petitioner in Nos. 75–1354 and 75–1355.

John N. Papajohn, Washington, D. C., was on the brief for petitioner in No. 75–1520.

Robert E. McKee and Howard A. White, New York City, were on the brief for petitioners in No. 75–1539.

J. Laurent Scharff, William H. Fitz and George R. Clark, Washington, D. C., were on the brief for petitioners in No. 75–1596.

James A. McKenna, Jr., Thomas N. Frohock, and Steven A. Lerman, Washington, D. C., were on the brief for petitioners-appellants in Nos. 75–1313, 75–1314, 75–1315, 75–1345, 75–1346, 75–1347, 75–1603 and 75–1640.

Cynthia R. Clarke, Washington, D. C., was on the brief for appellant-petitioner in Nos. 75–1637 and 75–1638.

Robert L. Heald, Edward F. Kenehan and James P. Riley, Washington, D. C., were on the brief for petitioners-appellants in Nos. 75–1185, 75–1186, 75–1413, 75–1414, 75–1746, 75–1747, 75–1689, 75–1690. Frank U. Fletcher and Richard Hildreth, Washington, D. C., entered appearances for appellants in No. 75–1185, and petitioners in No. 75–1186.

John S. Yodice, Washington, D. C., was on the brief for petitioner in No. 75–1827.

John P. Bankson, Jr., Washington, D. C., was on the brief for petitioners-appellants in Nos. 75–1405 and 75–1406.

John D. Lane and Ramsey L. Woodworth, Washington, D. C., were on the brief for petitioner in No. 75–1834.

Robert E. Conn, New York City, entered an appearance for appellant-petitioner in Nos. 75–1846 and 75–1847.

Before TAMM and MacKINNON, Circuit Judges, and KAUFMAN,* United States District Judge for the District of Maryland.

Opinion for the court filed by MacKINNON, Circuit Judge.

Concurring opinion filed by TAMM, Circuit Judge.

MacKINNON, Circuit Judge:

■ Petitioners-appellants [1] in these consolidated cases challenge the validity of a

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. In doubt as to whether review was authorized by 47 U.S.C. § 402(a) (1970) and 28 U.S.C. § 2342 (1970) (petitions for review), or by 47 U.S.C. § 402(b) (1970) (appeals), many of the parties initiated review proceedings under each, in the alternative. The two paths are, however, "by definition mutually exclusive" and a given order may not be reviewed under both. *Rhode Island Television Corp. v. FCC*, 116 U.S.App.D.C. 40, 44, 320 F.2d 762, 766 (1963), *quoting Functional Music, Inc. v. FCC*, 107 U.S.App.D.C. 34, 38, 274 F.2d 543, 547 (1958), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959). Since the parties seeking review of 11 of the 81 cases consolidated here (Nos. 75–1155, 75–1262, 75–1277, 75–1278, 75–1520, 75–1539, 75–1596, 75–1597, 75–1598, 75–1827, and 75–1834) filed only petitions for review under section 402(a), we must decide whether that section is the proper basis for our jurisdiction.

Initially, we note that in similar but not identical circumstances, the Fifth Circuit reviewed an order of the FCC under section 402(a). *Clay Broadcasting Corp. of Texas v. United States*, 464 F.2d 1313, 1315 n. 1 (5th Cir. 1972), *rev'd on other grounds*, 415 U.S. 336, 94 S.Ct. 1146, 39 I .Ed.2d 370 (1974). There, the order under review was the one establishing the fee schedule, while here they are orders denying refunds; in both cases, however, the effect is to deprive the parties seeking review of their money for allegedly improper reasons.

The statute itself appears quite clear: except for the eight specific cases listed in section 402(b) (none of which concern refunds or fee assessments), "*[a]ny* proceeding to enjoin, set aside, annul or suspend *any order* of the [Federal Communications] Commission under this chapter . . . *shall* be brought [by a petition for review under 28 U.S.C. § 2342]." 47 U.S.C. § 402(a) (1970) (emphasis added). In *Tomah-Mauston Broadcasting Co. v. FCC*, 113 U.S.App.D.C. 204, 306 F.2d 811 (1962), we held that an order which is "ancillary" to one of the eight types of Commission action specified in section 402(b) may be reviewed under that section. Thereafter, in *Cook, Inc. v. United States*, 394 F.2d 84, 87 & n. 7 (7th Cir. 1968), the Seventh Circuit suggested that "ancillary" may mean "in aid of" as well as "subordinate to." In any event, we do not believe (nor does any party allege) that the orders presented for our consideration here can be considered "ancillary" to one of the actions listed under section 402(b), since the fees assessed were to reimburse the agency for the costs associated with rendering its services (as mandated by 31 U.S.C § 483a) rather than for a reason connected in any way with the purposes specified in section 402(b). As such, the proper basis for our jurisdiction here is 47 U.S.C. § 402(a) and 28 U.S.C. § 2342, *see* note 3 *infra*, and this court has jurisdiction to hear the claims of all parties.

Petitioners-appellants will hereinafter be referred to simply as petitioners.

group of final orders[2] of the Federal Communications Commission (FCC) which deny refunds of fees paid under the Commission's 1970 fee schedule.[3] We agree that the fees in question were illegally assessed, and thus that refunds of those fees were improperly denied; we therefore remand these actions to the FCC to determine proper fees and refund the portion illegally collected.

As we explain in greater detail in a companion case decided this same date,[4] the 1970 fee schedule was promulgated by the FCC under the authority of Title V of the

Independent Offices Appropriations Act of 1952 (IOAA),[5] which decreed that federal agencies should thereafter assess fees for any "work, service, publication, report, document, benefit, privilege, authority, use franchise, license, permit, certificate, registration, or similar thing of value or utility" conferred by the agency on any person, so that those transactions would be "self-sustaining to the full extent possible." The fee schedule was challenged in the Fifth Circuit by, among others, some of the parties who are now before us, and was upheld

**2.** *See* note 11 *infra.*

**3.** As we explain above, *see* note 1 *supra,* the basis for our jurisdiction in this case is 47 U.S.C. § 402(a) and 28 U.S.C. § 2342. The latter statute provides:

The court of appeals has *exclusive jurisdiction* to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47 . . . .
Jurisdiction is invoked by filing a petition as provided by section 2344 and this title.

28 U.S.C. § 2342 (1970) (emphasis added). A number of petitioners have concurrently filed suits for refund in the Court of Claims, and at least one, American Telephone & Telegraph Co., argues that that tribunal has sole jurisdiction to hear this case. *See* AT&T Brief at 12.

We believe that we have exclusive jurisdiction to determine the *validity* of the final orders denying refunds under the plain wording of the above-quoted statute. However, a clear distinction must be made between that authority, which resides only in this court, and the power to actually order refunds, which is vested in both the district court and in the Court of Claims. *Clapp v. United States,* 117 F.Supp. 576, 127 Ct.Cl. 505, *cert. denied,* 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954). Whether a court of appeals has the *authority* to itself grant refunds in a case like this is a question we need not address, for in this case that course of action is not open to us. In order to direct specific refunds, we would be required to determine the amount of the refund and the record before us is insufficient for that. We therefore are limited to adjudicating the validity of the orders denying refunds, and remanding to the Commission for further action.

We reject the argument of counsel for AT&T that the FCC itself has no power to order refunds. *See* AT&T Brief at 12. Absent some statutory complication or administrative barrier, the power to refund fees that are unlawfully collected is implicit in the power to assess fees. Here, the IOAA has empowered the FCC to prescribe a "fair and equitable" fee for each of

the services it performs, 31 U.S.C. § 483a (1970), a command which would have little meaning if the agency were unable to refund that portion of an already-collected fee that had been determined to be unfair or inequitable. Since refunds of fees improperly assessed under the IOAA are thus "necessary" to the execution of a function of the Commission, the authority to make such refunds is impliedly granted to the FCC by 47 U.S.C. § 154(i) (1970). Where, as here, the agency has announced its intention to refund payments "in excess of an applicable fee," *see* 47 C.F.R. § 1.1111 (1971), has the funds available to do so, and has done so in the past, there can be no question of its authority to do so (subject to judicial review). *Cf.* 31 U.S.C. §§ 711(3), 725q–1 (1970). Procedurally, the FCC's action will take the form of a certification to the Treasury Department that the refunds are proper charges, *see* General Accounting Office, Policy and Procedures Manual for Guidance of Federal Agencies, Title 7, § 25.11 (1970). Settlement action by the General Accounting Office is not involved. *Id.*; Comptroller General Directive No. B–142380 (unpublished, March 24, 1960).

Thus, a party before the Commission has two alternative procedures which may be followed if the Commission itself denies a refund: (1) a petition for review may be filed in the court of appeals challenging the validity of the order denying the refund, or (2) an action seeking a money judgment may be filed in either the federal district court or the Court of Claims. In the present case, many of the petitioners have availed themselves of both alternatives. Believing it to be a question best addressed by the Court of Claims, we express no opinion as to the proper disposition of the actions filed in that court in light of our remand order to the Commission.

**4.** *National Cable Television Assn. v. FCC,* 180 U.S.App.D.C. ——, 554 F.2d 1094 (1976).

**5.** Act of Aug. 31, 1951, ch. 376, Title V, § 501, 65 Stat. 290, *as codified,* 31 U.S.C. § 483a (1970).

by that court in all respects in *Clay Broadcasting Corp. of Texas v. United States.*[6] Only one party (the National Cable Television Association) sought review of that decision in the Supreme Court, limited to the issue of the validity of the cable television annual fee.[7] In *National Cable Television Association v. United States (NCTA),* 415 U.S. 336, 344, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974), the Court reversed "so that the case can be remanded to the Federal Communications Commission for further proceedings consistent with this opinion."

After remand, the Commission suspended future collection of the annual fee for both broadcast systems and cable television systems pending revision of the 1970 fee schedule,[8] and refunded all *cable television* annual fees which had been collected under that fee schedule.[9] The remaining fees assessed by the 1970 fee schedule against other regulated industries in the other areas of the Commission's operation,[10] however, were neither refunded nor suspended.

After receiving a number of protests and refund requests on individual fees (other than the cable television annual fee) paid under the 1970 schedule, the FCC issued a series of opinions and orders denying refund requests generally.[11] Those orders

form the basis for the instant petitions for review.

I.

The threshold question in these cases is whether petitioners have any basis for seeking recovery since they never appealed the decision in *Clay Broadcasting*,[12] which upheld the fees now challenged here. The only appeal from that decision was by cable television operators who questioned the validity of their annual fee, which is not at issue here. Thus we must decide whether, by failing to appeal that decision, petitioners waived their rights to challenge the 1970 fee schedule further, and what effect the decision of the Supreme Court in *NCTA* has upon this question.

■ Petitioners' first argument is that the Supreme Court, by deciding that the cable television annual fee was improperly measured and by reversing and remanding for further proceedings,[13] effectively struck down the entire 1970 fee schedule. We cannot agree that the Supreme Court's action in *NCTA* is to be so broadly viewed. As we have already observed, the issue before the Court in that case was specifically limited to the validity of the cable television annual fee;[14] and the language of the Court's opinion, although vague in places,

---

6. 464 F.2d 1313 (5th Cir. 1972), *rev'd,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

7. In its petition for certiorari, the National Cable Television Assn. defined the issues as follows:
     1. Whether the Federal Communications Commission's *CATV regulatory scheme* confers "value to the recipient" as required by Title V of the Independent Office Appropriation Act, *in order to justify an annual fee on the CATV industry.*
     2. Whether the Commission may recover the full cost of *its regulation of the CATV industry* where the fees are unrelated to specific services performed by the Commission. NCTA Petition for Certiorari at 2–3 (emphasis added). The Association went on to pointedly note that "it is *only* the annual assessment which is under attack, not the fees for the filing of applications." *Id.* at 29 (emphasis added).

8. 46 F.C.C.2d 12 (1974).

9. 49 F.C.C.2d 1089 (1974).

10. The Commission assessed fees under the 1970 fee schedule in the following six areas of its operation: Radio Broadcast Services, Common Carrier Services, Safety and Special Radio Services, Cable Television Services, Field Operations (Commercial Radio Operator Applications), and Chief Engineer (Equipment Testing and Approval). *See generally* 47 C.F.R. §§ 1.1101–1.1120 (1971).

11. 50 F.C.C.2d 730, *reconsideration denied,* 52 F.C.C.2d 666 (1975); 51 F.C.C.2d 545, *reconsideration denied,* 53 F.C.C.2d 207 (1975); 53 F.C.C.2d 854 (1975); 54 F.C.C.2d 515 (1975).

12. *See* note 6 *supra* and accompanying text.

13. *See* text *supra,* 180 U.S.App.D.C. at ——, 554 F.2d at 1122–1123.

14. *See* note 7 *supra.*

cannot be said clearly to go beyond that defined issue.[15]

▮ It is the generally accepted rule in civil cases that where less than all of the several co-parties appeal from an adverse judgment, a reversal as to the parties appealing does not necessitate or justify a reversal as to the parties not appealing.[16] Moreover, even assuming *arguendo* that *NCTA* could be read as passing directly on the validity of the entire 1970 fee schedule,

it would not be appropriate for this court to so hold: the proper method for raising that issue would have been by a petition for rehearing in the Fifth Circuit following remand by the Supreme Court. Therefore, we believe that the Court's reversal of *Clay Broadcasting* was only a reversal as to the issue which was presented to it by the cable operators, and cannot be interpreted as invalidating the *entire* fee schedule.[17]

---

**15.** "Only the questions set forth in the petition [for certiorari] or fairly comprised therein will be considered by the court." Rev.R.Sup.Ct. 23(1)(C). Questions which are not mentioned in the petition for certiorari are not properly before the Supreme Court for consideration. *Namet v. United States*, 373 U.S. 179, 190, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); *Beck v. Washington*, 369 U.S. 541, 553, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *Lawn v. United States*, 355 U.S. 339, 362 n. 16, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The Supreme Court therefore limits its review on certiorari to questions specifically raised in the petition. *Mazer v. Stein*, 347 U.S. 201, 208, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *National Licorice Co. v. NLRB*, 309 U.S. 350, 357 n. 2, 60 S.Ct. 569, 84 L.Ed. 799 (1940); *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175, 177–79, 58 S.Ct. 849, 82 L.Ed. 1548 (1938); *Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*, 304 U.S. 159, 161, 58 S.Ct. 842, 82 L.Ed. 1265 (1938). Here, the petition for certiorari was clearly limited to the validity of the cable television annual fee, *see* note 7 *supra*, and given the narrow wording of that petition we cannot agree with petitioners' contention that the question of the validity of the entire fee schedule is "fairly comprised therein."

This rule, of course, does not limit the power of the Supreme Court to decide important questions not raised by the parties. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 320–21 n. 6, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The rule has certain well-recognized exceptions, particularly in cases arising in the federal courts. *See generally* R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court of the United States § 418 (R. Wolfson & P. Kurland ed. 1951); R. Stern & E. Gressman, Supreme Court Practice § 6.37 (4th ed. 1969). None of these seem applicable to the *NCTA* decision, however; there are no exceptional circumstances, important questions of judicial administration in the federal courts, or plain errors here. Moreover, when the Supreme Court has decided a question which was not raised in the petition for certiorari, it has invariably done so *explicitly*. *See, e. g., Blonder-Tongue*, 402 U.S. at 317, 91 S.Ct. 1434; *Moragne v. States Marine Line, Inc.*, 398 U.S. 375, 380 n. 1, 90 S.Ct. 1772, 26

L.Ed.2d 339; *Erie R.R. v. Tompkins*, 304 U.S. 64, 66, 68–69, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). No indication of any intent to go beyond the petition for certiorari appears in the *NCTA* opinion.

Petitioners cite several loose references to broadcasters and the broadcast industry in the *NCTA* opinion in an attempt to support a broad reading of that decision. *See, e. g.,* ABC Brief at 23, *citing* 415 U.S. at 341, 94 S.Ct. 1146; NAB Brief at 27, *citing* 415 U.S. at 341–42, 94 S.Ct. 1146; WHTN–TV Brief at 11, *citing* 415 U.S. at 343, 94 S.Ct. 1146. These scattered references to parties other than cable television operators are not enough to allow us to find an intention on the part of the Supreme Court to invalidate the entire fee schedule.

**16.** *See, e. g., Culbertson v. Cizek*, 225 Cal. App.2d 451, 470–472, 37 Cal.Rptr. 548, 559 (1964); *Mulligan v. First Nat'l Bank & Trust Co. of Lexington*, 351 S.W.2d 59, 60–61 (Ky. 1961); *Ulrich v. Mpls. Boxing & Wrestling Club, Inc.*, 268 Minn. 328, 335–336, 129 N.W.2d 288, 294 (1964); *Frankel v. Berman*, 10 App. Div.2d 838, 199 N.Y.S.2d 261 (1960); *Modine Mfg. Co. v. North East Ind. School Dist.*, 503 S.W.2d 833, 845–46 (Tex.Civ.App.1973); 5B C.J.S. Appeal & Error § 1920 (1958); 5 Am. Jur.2d Appeal & Error § 951 (1962). This rule is subject to the exception that where a proper decision of the case as to the appealing parties is dependent upon the judgment as to the parties not appealing, the judgment must be reversed as a whole. The fact that the appealing and nonappealing parties have a similar economic interest, however, is not enough. For example, in *Campbell v. Cavett*, 195 Okla. 278, 157 P.2d 187 (1945), an appellate court, in passing on the right of a life beneficiary of a testamentary trust in a testator's residuary estate to a proportionate share of the income of the estate pending its administration, refused to pass on the right of other beneficiaries to that income where they had failed to appeal from the trial court's decision.

**17.** A somewhat different issue is the effect of the decision in *Clay Broadcasting* as collateral estoppel in the present case. *See* 1B J. Moore,

This is not to say, however, that the *principles* laid down by the Court in *NCTA* do not call into question the validity of the entire 1970 fee schedule: although the *NCTA* opinion cannot be read as having acted upon anything other than the validity of the cable television annual fee, that decision is strong precedent on the validity of other fees adopted at the same time. We are not unmindful that the fees imposed on broadcasters are worlds apart from the annual cable television fee. The basis for the two fees is radically different both in the nature of the services rendered and in the variety of services. Nonetheless, the general rules of *stare decisis* apply. Certainly, by remanding "for further proceedings consistent with this opinion," [18] the Supreme Court intended (but did not require) that the

Commission should review the future application of its *entire* fee schedule to the extent that the application of such schedule in the future might violate its decision. In fact, that is what took place,[19] and a new fee schedule was adopted on January 15, 1975.[20] The distinct question now before us is whether petitioners are entitled to a refund of fees assessed *before* that time under the now-doubtful 1970 fee schedule in light of the principles announced in *NCTA*.

In the present case, petitioners are seeking refund of the specific charges which they paid between 1970 and 1975. Some of the petitioners here participated in the earlier Fifth Circuit challenge to the order establishing the 1970 schedule, but none were parties to the ultimately successful

---

Federal Practice ¶ 0.450[1] (1974). The argument appears to be that many of the petitioners here participated in *Clay* and failed to appeal the non-cable portion of that decision to the Supreme Court, and that they are therefore bound by the judgment in *Clay* upholding the non-cable portions of the 1970 fee schedule and cannot now ask for refunds. However, this issue was not briefed by the parties here and is therefore not properly before us. *Cf.* Fed.R. Civ.P. 8(c). At oral argument, the Government counsel stated:

> I think there is some argument [on the collateral estoppel issue] with respect, certainly, to the members of the National Association of Broadcasters and to the other parties in *Clay Broadcasting* before the Fifth Circuit, but the Commission has not relied on that theory.

(Transcribed from oral argument). Under such circumstances, we hold that the issue has been waived.

The rule which controls this case has been stated by Professor Moore:

> A judgment may . . . be reversed by an appellate court on a single ground, and remanded with other determinations of the trial court left intact. In such a case, the unreversed determinations of the trial court are generally adhered to on remand; *but this is an application of the doctrine of law of the case, rather than res judicata or collateral estoppel.* And since the unreversed prior determinations were made by the trial court, *the law of the case doctrine addresses itself to that court's discretion only, and does not compel adherence.*

1B J. Moore, *supra* at ¶ 0.416[2] (emphasis added, footnotes eliminated). This is consistent with the disposition we make of the present case. *See* above text *infra*, 180 U.S.App.D.C. at ——, 554 F.2d at 1125–1128.

**18.** 415 U.S. at 344, 94 S.Ct. at 1151.

**19.** Prior to the decision in *NCTA*, the FCC had instituted a new rulemaking proceeding which proposed a general increase in its 1970 fee schedule. 38 F.C.C.2d 587 (1972). After review of comments submitted, the Commission adopted a Report and Order in that proceeding establishing a new schedule of fees that was to become effective May 1, 1974. *See* FCC News Report No. 9201 (February 27, 1974). Before the newly-adopted schedule was released, however, the Supreme Court handed down its decision in *NCTA*, and the Commission decided *sua sponte* to reconsider the new schedule in light of that decision. FCC News Report No. 9233 (March 8, 1974). In a *Further Notice of Proposed Rulemaking*, 48 F.C.C.2d 402 (August 12, 1974), the Commission proposed extensive revisions of its *entire* fee schedule, and acknowledged that the Further Notice

> reflects the remand of the case for further proceedings directed by the Supreme Court with respect to the cable television annual fee and, in addition, proposes other revisions in the schedule of fees in light of the Court's interpretation of the statute.

*Id.* at 403. More specifically, the Commission referred to the *NCTA* decision and went on to say:

> Although the Court's decision was limited to the issue of the cable television annual fee, it appears to have rejected the concept that the Commission's fees should approximate its budget.

*Id.* at 404.

**20.** 50 F.C.C.2d 906, *reconsideration granted in part and denied in part*, 52 F.C.C.2d 333 (1975).

petition of the cable companies to the Supreme Court.[21] They have had no previous opportunity to question the validity, under the principles laid down in *NCTA*, of the fees assessed against them under the 1970 fee schedule. There seems to be no good reason now to deny them that opportunity.

■ The Government argues against our jurisdiction here by observing that all of the petitioners have already had an opportunity to challenge the specific fees assessed against them at the time when payment was required.[22] Apparently, such a challenge would have required the withholding of payment while judicial review was being pursued. This simplistic argument overlooks several important facts. First, the fees in question here are those assessed for filings, for the grant of certain necessary authorization, and for the basic operating authority of broadcasters. The Commission has indicated in no uncertain terms that these fees must be paid when the service is furnished, with serious consequences for the party assessed if they are not.[23]

**21.** Although petitioner NAB, and petitioners AT&T and Independent Telephone Assn., filed briefs amicus curiae in the *NCTA* case in the Supreme Court challenging parts of the 1970 fee schedule other than the cable television fee, NAB Brief at 12; Govt. Brief at 33 n. 17; J.App. 342, there is no indication that the Court accepted these invitations to expand its review beyond the questions presented in the petition for certiorari. *See* note 15 *supra*.

**22.** Govt. Brief at 43 n. 25. *See also* 52 F.C.C.2d 666, 667 (1975).

**23.** For example, 47 C.F.R. § 1.1102(d) (1972) states:

All grants, approvals and authorizations issued by the Commission are made subject to payment and receipt of the applicable fee within the required period. *Failure to make payment of the applicable fee to the Commission by the required date shall result in the grant, authorization or approval becoming null and void and ineffective after that date.* (Emphasis added). The Commission has explained the use of this language as follows:

In Section 1.1102 of our rules dealing with the payment of fees, we attempted to establish a system of payment which was most practicable to those responsible for the payment of fees and which, at the same time, would not operate to delay or hold up our substantive actions in processing applica-

Second, any judicial challenge under sections 402(a) and (b) of the Communications Act, 47 U.S.C. §§ 402(a), 402(b) (1970), presupposes an appealable decision or order by the Commission; but no such "order" accompanies each individual assessment. Payment followed by a refund request is for practical purposes required in order to precipitate such a reviewable order. Finally, and most importantly, the Commission staff has indicated that payment followed by refund is the preferred procedure:

The grant fee is . . . payable on closing. If Cowles wishes, it can file a request for refund after payment, which is the procedure followed in other cases, and which is set forth in Section 1.1102(d) of the Commission's Rules. The only exception to the principle of paying the grant fee assessed by the Commission on closing has occurred on occasions when the Commission has had difficulty in deciding the size of the grant fee and did not wish to delay grant of the application in question pending a decision on the grant fee.

tions and issuing grants, approvals and authorizations. Thus, subparagraph (d)(1) [*sic*: *see* 47 C.F.R. § 1.1102(c)(1) (1971)] provided that required grant fees are payable within 45 days after grant by the Commission or, in the case of assignments or transfers of control in the broadcast services, immediately following consummation of the transfer or assignment. Unfortunately, however, this accommodation has been abused by some recipients of Commission authorizations in the past six months who have failed or refused to pay the required fee even after specific notification by the Commission. We are, therefore, pointing up, by the insertion of additional language in this subparagraph, now numbered Section 1.1102(d), that all grants, approvals and authorizations issued by the Commission are made subject to payment and receipt of the applicable fee within the required period, and that failure to make payment of the applicable fee to the Commission by the required date shall result in the grant, authorization or approval becoming null and void and ineffective after that date. 28 F.C.C.2d 139, 154–55 (1971). This and similar provisions, *see, e. g.*, 23 F.C.C.2d 880, 886 (1970), effectively prohibit persons against whom fees are assessed from withholding payment pending an administrative or judicial challenge.

31 F.C.C.2d 525, 526 (1971). Although 47 C.F.R. § 1.1002(d) (1971), referred to in the quotation above, makes no mention of refunds, section 1.1103 does contemplate refunds of "payments in excess of an applicable [legal] fee." Because the Commission has made it both preferable and necessary to protest a fee assessment only after payment and publicly declared that policy, it is now estopped from requiring the petitioners to follow another procedure.

■ A greater obstacle to review in this court, in our eyes, is the fact that all of the petitioners now before us could have appeared before the Fifth Circuit upon remand of the *NCTA* case from the Supreme Court to request that the court of appeals consider its decision in *Clay Broadcasting*

regarding the entire 1970 fee schedule, but did not do so. Absent extenuating circumstances, we would normally be inclined to hold that they had thereby waived any further challenge to the fees they were contesting in that action. But here petitioners justifiably relied on statements by the FCC to the effect that action on refunds would be taken by the Commission on its own initiative.[24] Since the FCC led petitioners to believe that more timely action on their part was unnecessary, the prior possibility of an application to the Fifth Circuit on remand cannot bar the present suit.

■ We conclude that we have jurisdiction to consider petitioners' request that we review the agency's action at this time. In

---

**24.** Prior to the judicial challenges to the 1970 fee schedule which culminated in the *NCTA* decision by the Supreme Court, the agency denied a stay pending its own reconsideration of the fee schedule. In so doing, it stated that "*[t]he Commission will maintain adequate records so that it can make refunds in the event that 'a more moderate fee' schedule is adopted on reconsideration.*" 24 F.C.C.2d 614, 615 (1970) (emphasis added). Consistent with this intent, all funds collected under the 1970 fee schedule were escrowed in a suspense account at the Treasury. *See* note 27 *infra.* This is indicative that the Commission intended its statement, *supra,* to apply to *all* such fees, and those who paid fees under the 1970 schedule are justified in relying upon the Commission's representation. Upon reconsideration, certain minor adjustments were made, and the Commission declared refunds without further ado:

As a result of revisions in the fee schedules adopted herein, certain refunds are in order and *appropriate action to accomplish them will be taken by the Commission on its own initiative.* The completion of this task may take some time, and the filing of individual requests for refund at this time will only serve to delay the date of completion. It is, therefore, requested that parties await action by the Commission in this regard. If, however, any person claiming entitlement to a refund has not received such refund within 60 days after the issuance of this order, he should then advise the Commission of his claim.

28 F.C.C.2d 139, 155 (1971) (emphasis added). This disposed of the initial correction in the fee schedule but there is no reason not to apply the same representation to the more moderate fees now being challenged. Both exceeded permissible limits.

Following the decision in *NCTA,* the Commission responded to petitions by cable opera-

tors for refund of cable fees with a similar statement of intent:

We have concluded that we should refund all of the cable television annual fees paid pursuant to the current [1970] fee schedule. . . . *It is our present intention to initiate refunds without requiring any further action on the part of cable television system operators,* and we will proceed as expeditiously as possible to make the appropriate refunds.

49 F.C.C.2d 1089 (1974) (emphasis added). At that time, broadcast as well as cable annual fees had been suspended, and the Commission had pending before it refund requests from a variety of parties other than cable operators. *See, e. g.,* J.App. 367. Moreover, in an affidavit dated June 17, 1974, filed in the Court of Claims in regard to several actions there seeking recovery of fees under *NCTA,* the General Counsel of the FCC stated:

The Commission now has the petitions and claims for refund under consideration, and my office is researching the applicable law and facts surrounding the refund question. A ruling on the petitions and claims may be expected within the near future.

Affidavit of Ashton R. Hardy, *Cannon Beach TV Co. v. United States,* (Ct.Cl. No. 82–74) (J.App. 416–17). The Commission, therefore, lulled the industry into believing that refund requests would be acted upon without the necessity for further proceedings before the Fifth Circuit. The Commission gave no indication, prior to the orders on review here, that they were placing the broadcast industry in a different category from the cable companies with respect to refunds under the 1970 fee schedule. Thus, we cannot say that petitioners erred in failing to seek a clarification or reconsideration in *Clay Broadcasting.*

so holding, we have considered and rejected two additional bars to review argued by the parties here: "the voluntary payment" doctrine and laches.[25] As to the former, the short answer is that these payments were not in any sense "voluntary." *See* note 23 *supra; Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 329, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); *Swift Co. v. United States,* 111 U.S. 22, 4 S.Ct. 244, 28 L.Ed. 341 (1884). As regards the latter, we note that neither unreasonable delay[26] nor prejudice to the defendant,[27] both necessary elements of laches, *Powell v. Zuckert,* 125 U.S.App. D.C. 55, 57, 366 F.2d 634, 636 (1966), has been shown here. Therefore, these two defenses cannot be raised to bar our review in this action.

### II.

The difficult questions presented by this case are all procedural: whether petitioners have any basis for suit in this court (discussed in the previous section), and what remedy is to be applied (discussed in the next section). Having resolved the former question in favor of petitioners, the substantive issue of the validity of the claims for refunds is easily decided: clearly, the principles laid down by the Supreme Court in *NCTA* require us to strike down the entire 1970 fee schedule, and having done this, to declare that the FCC erred in denying petitioners' refund requests. While it is true that the broadcast businesses of many of the petitioners here are tremendously different, both in the extent and character of their operations, from the relatively small cable operations that were before the Court in *NCTA,* the Court in that decision did enunciate principles which require us to find that the entire fee schedule here questioned by the broadcasters, and applicable to them, included improper elements, and therefore that the fees imposed exceeded permissible amounts. However, because the evidence in this record is insufficient, it is impossible for us therefrom to determine the dollar or precise percentage range for a proper fee.

In *NCTA,* the Court invalidated the cable television annual fee because it charged cable operators a fee based in part upon "public policy or interest served." 415 U.S. at 341, 94 S.Ct. 1146. The Court held that, although some language of the IOAA of 1952 appears to allow a fee with such elements, charging in part for an independent public interest served (rather than solely for value conferred upon the recipient) makes the assessment a *tax* rather than a fee. It concluded that the IOAA must be narrowly read to prohibit this since there was no indication in the statute of an intent on the part of Congress to delegate the power to tax to the FCC. 415 U.S. at 342, 94 S.Ct. 1146.

However, the incorporation of compensation for public interest elements into the 1970 fee schedule was not limited to the cable television annual fee: the agency's comments in proposing and adopting the 1970 fee schedule make it clear that "the public interest served" was considered in setting *all* the fees:

> [T]he rationale for the formulation of the new fee schedule gives explicit recognition, in appropriately varying degrees, to the "value to the recipient" of the privi-

---

**25.** Neither of these defenses was mentioned in the Government's brief, and they are therefore waived. *Cf.* Fed.R.Civ.P. 8(c). But we address the issues briefly because they were relied upon in various forms by the FCC in refusing the refunds at issue here, *see* 50 F.C.C.2d 730, 734 (1975), 52 F.C.C.2d 666, 667 (1975), 53 F.C.C.2d 730, 732–33 (1975), 52 F.C.C.2d 666, 667 (1975) (laches?).

**26.** What delay there was (and the Government alleges none in its brief) cannot be said to be unreasonable. *See* note 24 *supra.*

**27.** The money collected under the 1970 fee schedule has been placed in a "suspense account" at the Treasury to allow the Commission to deposit collections "without losing access to them for such purposes as refunds." NAB Brief at 17. Because of the existence of this suspense account and the prelitigation pledge of the FCC to maintain "adequate records" in order to make refunds if necessary, *see* note 24 *supra,* the possibilities of prejudice to the agency from any delay by petitioners is slight. No such prejudice is alleged by the Government here.

leges granted, as well as the public interest served and the direct and indirect cost to the Government.

21 F.C.C.2d 502, 504 (1970). *See also* 23 F.C.C.2d 880, 882, 883 (1970). This statement explicitly admits that the Commission did not base the fee schedule solely on "value to the recipient," as *NCTA* thereafter held it was required to do. 23 F.C.C.2d 880, 885 (1970); 21 F.C.C.2d 502, 505–06 (1970). Thus, to the extent that this standard is exceeded, all of the assessments made by the 1970 fee schedule are to some extent in the nature of taxes rather than fees, and the entire schedule is invalid.[28] It directly follows from this that the FCC

---

**28.** Judge Tamm has filed a very thoughtful concurring opinion which questions whether this opinion goes too far in attempting to apply the court decisions on the "value to the recipient" standard of the IOAA. Our decision also released today in *National Cable Television Association, Inc. v. FCC*, 180 U.S.App.D.C. ——, 554 F.2d 1094 (1976), more fully interprets the "value to the recipient standard." The concurrence recognizes that *NCTA* held that " 'value to the recipient' . . . [was] the measure of the authorized fee." From this "narrow interpretation," which he states necessarily eliminates the applicability of the other statutory considerations, and diminishes the power of agencies to set "fair and equitable" fees, he concludes that we should not "attempt to limit further . . . 'value to the recipient' as including only costs and not also the *value of benefits* bestowed on a regulatee."

We recognize the extent to which our opinion interprets "value to the recipient" as applied to the facts of this case but we consider that this strictly follows the two controlling decisions of the Supreme Court. We do not consider that we have limited the range of that phrase any more than it is limited by those decisions. *New England Power* specifically stated that the decision "greatly narrows *the Act* from the [boundaries] of the 'fee' system and away from the domain of 'taxes' . . ." 415 U.S. at 351, 94 S.Ct. at 1155 (emphasis added); and *NCTA* in categorical language rules that "public policy or interest served, and other pertinent facts," cannot in any way be reflected in the fee, 415 U.S. at 341, 343, 94 S.Ct. at 1150, and declares that " 'value to the recipient' . . . is . . . the measure of the fee." 415 U.S. at 342–343, 94 S.Ct. at 1150.

As for the "fair and equitable" provision of the IOAA, that is more a limitation on the power to prescribe fees based on other standards than a grant of authority to impose them. If it were the latter the delegation of power would be practically limitless; but as a limitation it operates on all fees promulgated pursuant to the prescribed standards and requires them to be fair and equitable *inter sese.*

In suggesting that the "value of benefits bestowed" on a regulatee could be included in the fee, *and that same would include factors beyond "costs,"* the concurrence is apparently suggesting that the fee base could go so far as to include values created by licensees out of their grants. For the reasons outlined in the body of the opinion we do not believe that the quoted Supreme Court decisions permit the inclusion of such factors. When the cost of the benefit conferred is exceeded by any material amount, one immediately gets into the taxing area and the result is revenue and not a fee.

The concurrence also states that it does not read *NCTA* as requiring "the proportion-of-cost basis" as the only acceptable method of determining a fee. That may well be so. It may be possible that a proper fee may be fashioned on other lines. We do not mean to circumscribe the ingenuity of the agencies in dealing with this problem. But there still remains the overall requirement that the proceeds be fairly related to costs and that a proper nexus exist between the service, the cost of the service and the fee charged for the service. The fee must bear some reasonable relation to the cost or it ceases to be a fee and *NCTA* does indicate that it cannot go beyond being a "fee."

Limiting the definitions of value to some proportion of the agency's cost, the concurrence observes, would also prevent the agency from becoming completely self-sustaining. This conclusion is self-evident but it is a result foreseen and in effect commanded by *NCTA* and *New England Power* and we are bound by those decisions which "greatly narrow[ ] the Act." 415 U.S. at 351, 94 S.Ct. 1151. If any change is to be made in this situation it must come from Congress or the Supreme Court. In this connection it should also be noted that *NCTA,* as part of the basis for its opinion, relied on Art. I. § 1 and § 8, par. 18 of the Constitution in holding that taxation is an essential legislative function that Congress cannot "abdicate or transfer to others." *NCTA,* 415 U.S. at 342, 94 S.Ct. 1146. Once agency charges exceed their reasonable attributable cost they cease being fees and become taxes levied, not by Congress, but by an agency. This, the cases hold, is prohibited. It should also be noted, however, that the Supreme Court decisions did not read out the ability of agencies to recoup the attributable "direct *and indirect costs*" authorized by 31 U.S.C. § 483a. *NCTA,* 415 U.S. at 341, 343, 94 S.Ct. 1146.

As to whether it is possible under *NCTA* to promulgate "value to recipient" fee schedules not initially related to costs, we express no opinion. We have elsewhere discussed the over-all cost and other limitations imposed by *NCTA, New England Power,* the IOAA and the circular. The suggestion that the matter

improperly denied the refund orders at issue here, for it would be improper to allow the Commission to retain money illegally exacted and paid involuntarily and under protest (in many cases made contemporaneously with payment), especially in light of its action in refunding cable annual fees [29] and its implied pledges to do so in other appropriate cases.[30]

### III.

With the issue of the validity of the refund denials resolved in favor of the petitioners, the remaining question is the remedy to be granted them by this court. Since it would be impossible on the record before us to order refunds ourselves,[31] we will remand this case to the agency for such action. In doing so, however, we feel compelled, to the extent that the present record permits us to do so, to specify. the exact nature of the refunds to be granted, so as to finally terminate this lengthy litigation. In particular, we address two questions raised by the parties: (1) can *NCTA* be applied retroactively by this court so as to allow refund of fees paid before the date of that decision (March 4, 1974); and (2) what portion of the money paid is to be refunded?

should be left to the agency for *de novo* action on the "value to recipient" standard has already been exhausted. The agency has already had several times at bat and if the case were to be remanded for further action with our deciding less than we have by this opinion, we do not feel that we would have adequately dealt with the issues fairly presented by this record and the litigation could go on endlessly over specific items. It must be recognized that in the present state of the law under the controlling Supreme Court rulings and the existing statutes, most agencies could never become completely self-sustaining from "fees" of regulatees. The statutory mandate, however, is only that they become self-sustaining "to the full[est] extent possible." 31 U.S.C. § 483a.
It should also be stated that we are not requiring exact calculations, just reasonable approximations. The ability to recoup both "direct and *indirect costs* to the Government" does allow for some range and latitude in effecting a reasonable attribution of costs.

29. *See* note 9 *supra.*

30. *See* note 24 *supra.*

The first question arises because, as we have above held, our decision in these cases is controlled by principles established by the Supreme Court in *NCTA*. The effect of the *NCTA* decision at minimum was to declare that, in the future (*i. e.,* after March 4, 1974), fees collected under the IOAA must conform to those principles; thus, some portion of the fees collected by the FCC under its nonconforming 1970 fee schedule *after* March 4, 1974, must clearly be refunded. The more difficult question involves the possible retroactive application of the *NCTA* decision to the period *before* March 4, 1974—that is, before the principles on which we rely today had been announced.

■ The general rule of long standing is that judicial precedents normally have retroactive as well as prospective. effect. *See, e. g., Linkletter v. Walker,* 381 U.S. 618, 622–23 & n.6, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *citing Kuhn v. Fairmont Coal Co.,* 215 U.S. 349, 372, 30 S.Ct. 140, 54 L.Ed. 228 (1910) (Holmes, J., dissenting); 1B J. Moore, Federal Practice ¶ 0.402[.3–2–1] (1974); Note, *Prospective Overruling and Retroactive Application in the Federal Courts,* 71 Yale L.J. 907 (1962). Nonetheless, many state courts have occasionally accorded their decisions only prospective effect under various theories,[32] and their pow-

31. *See* note 3 *supra.*

32. Some cases have applied then-existing law while it is announced in the same opinion that the law will be changed as to subsequent cases. *See, e. g., Arizona Tax Comm'n v. Ensign,* 75 Ariz. 376, 257 P.2d 392 (1943); *Spanel v. Mounds View School Dist. No. 621,* 264 Minn. 279, 118 N.W.2d 795 (1962); *Sunburst Oil & Refining Co. v. Great Northern Ry.,* 91 Mont. 216, 7 P.2d 927, *aff'd,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). Other cases have overruled prior precedent outright, but expressly preserved existing rights thereunder. *See, e. g., Hanks v. McDannell,* 307 Ky. 243, 210 S.W.2d 784 (1948). In yet another variation of the practice, some courts have on occasion employed a "reward theory," applying a new rule only prospectively except as to the plaintiff in the case before it, who receives the benefit of the changed law as a reward for his effort and expense in challenging the old doctrine. *See, e. g., Molitor v. Kaneland Community Unit Dist. No. 302,* 18 Ill.2d 11, 163 N.E.2d 89 (1959), *cert. denied,* 362 U.S. 968, 80 S.Ct.

er to do so has been affirmed by the United States Supreme Court in *Great Northern Railway v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). The Supreme Court has also approved the use of this technique in the federal courts in *Linkletter v. Walker, supra,* 381 U.S. at 627–29, 85 S.Ct. 1731,[33] and the approach has been used, albeit infrequently, both by the Supreme Court and by our own court.[34]

In the case now before us, the Government argues that the effect given to the *NCTA* decision should be limited to that of a prospective change in the law. Govt. Brief at 39–42. The effect of this would be to deny petitioners refunds of any money paid before March 4, 1974; refunds could be ordered only as to fees paid after that date and before March 1, 1975, the effective date of the 1975 fee schedule.[35] To get around the fact that the Commission has already refunded annual fees paid by cable operators prior to March 4, 1974, the Government requests us to employ the "reward theory" of prospective overruling, *see* note 31 supra, whereby *NCTA* would be held to have changed the law only prospectively as to all persons except cable operators, who would receive the benefit of a retroactive application of the new rule as compensation for the time and effort they spent in challenging the 1970 fee schedule. Petitioners, of course, favor a full retroactive application of *NCTA.*

Perhaps the best resolution of the problem has been suggested by Professor Moore, who states:

[S]ome judicial decisions elaborate or augment previously articulated doctrine; and some alter or reverse it. Whether decisions in [these] ought to be given retroactive operation as precedent is a problem that ought not to be resolved by a philosophical absolute so abstract as the Blacksonian declaratory theory. *The impact of retroactive application of the new rule, both on litigants and on the administration of justice as a whole, ought to be the basic considerations.*

1B J. Moore, *supra* at ¶ 0.402[3.–2–2] (emphasis added). Shortly thereafter, he expands upon this idea:

[W]e have . . . indicated that consistency in the administration of justice is a desirable goal, to be pursued in the absence of compelling circumstances justifying another result. Thus, unless a decision is quite unsound, it ought not normally to be overruled. If it is overruled, *the overruling decision ought not to be prospectively limited except for compelling reasons, such as justifiable reliance upon the old rule.* And if the overruling decision is prospectively limited, an exception ought not to be made to reward the winning litigant, as was done by the Supreme Court of Illinois in the *Molitor* decision. [*See* note 31 *supra* ]. These three steps represent progressive inroads on evenness and consistency in the administration of justice, and none should be taken lightly; unevenness and inconsistency in administering the law undermine public confidence in, and re-

---

955, 4 L.Ed.2d 900 (1960); *Parker v. Port Huron Hospital,* 361 Mich. 1, 105 N.W.2d 1 (1960); *Kojis v. Doctor's Hospital,* 12 Wis.2d 367, 107 N.W.2d 131 (1961).

**33.** "[T]he accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective." 381 U.S. at 628, 85 S.Ct. at 1737. The Court went on to observe that "we believe that the Constitution neither prohibits nor requires retrospective effect." *Id.* at 629, 85 S.Ct. at 1737. *But see* 1B J. Moore, *supra* at ¶ 0.402[3.–2–1]. Although *Linkletter* was a criminal case, the Supreme Court found this distinction irrelevant. 381 U.S. at 618, 85 S.Ct. at 1731.

**34.** *See, e. g., England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct.

461, 11 L.Ed.2d 440 (1964); *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *Gelpcke v. City of Dubuque,* 68 U.S. (1 Wall.) 175, 17 L.Ed. 520 (1863); *Dooling v. Overholser,* 100 U.S.App.D.C. 247, 243 F.2d 825 (1957); *Durham v. United States,* 94 U.S. App.D.C. 228, 214 F.2d 862 (1954), *overruled on other grounds, United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc); *Warring v. Colpoys,* 74 App.D.C. 303, 122 F.2d 642, *cert. denied,* 314 U.S. 678, 62 S.Ct. 184, 86 L.Ed. 543 (1941). *See generally* 1B J. Moore, *supra* at ¶ 0.402[3.–2–3].

**35.** 51 F.C.C.2d 372 (1975).

spect for, the judicial process and the rule of law itself.

*Id.* at ¶ 0.402[3.–2–4] (footnotes eliminated, emphasis added).

█ From the commentators, we can distill four relevant criteria for deciding whether to limit a decision to a prospective effect: (1) the extent of justifiable reliance upon the rejected precedent or rule; (2) the purpose of the newly announced rule; (3) the degree of finality of plaintiff's transaction; and (4) the element of surprise. *See* 1B J. Moore, *supra* at ¶ 0.402[3.–2–4]; Note, *Limitation of Judicial Decision to Prospective Operation,* 46 Ia.L.Rev. 600, 601 (1961); Note, *Prospective Operation of Decisions Holding Statutes Unconstitutional or Overruling Prior Decisions,* 60 Harv.L.Rev. 437, 440 (1947); Note, *The Effect of Overruled and Overruling Decisions on Intervening Transactions,* 47 Harv.L.Rev. 1403, 1404–05 (1934); Note, *Prospective Overruling and Retroactive Application in the Federal Courts,* 71 Yale L.J. 907, 940–51 (1962). Careful consideration of these four criteria leads inexorably to the conclusion that *NCTA* should be accorded retroactive effect.

By far the most important consideration of the four is the extent of justifiable reliance on the old rule. *See, e. g.,* 1B J. Moore, *supra* at ¶ 0.402[3.–2–4]. Since *NCTA* was a case of first impression,[36] and since the FCC had notice almost from the time it adopted the schedule that it would be subject to a challenge in court, there could be no justifiable reliance here; and indeed, the record demonstrates that there was none.[37] For the same reason, and because of the immediate protests and refund requests made by many of the petitioners,[38] we reject any idea that the Commission would be unfairly surprised by our action today as well as the notion that petitioners' "transactions" had become final and should not be disturbed.[39] As for the purpose of the rule announced in *NCTA,* it was to prevent the Commission from collecting money for activities for which it had no statutory right to charge. The same idea would prevent the agency from retaining money illegally exacted.

Therefore, we answer the first question in the affirmative: *NCTA* can and will be applied retroactively by this court to require refund of fees collected from petitioners under the 1970 fee schedule to the extent that they exceeded legally permissible amounts. The question which remains is what *portion* of the fees was improperly collected.

Petitioners argue that the 1970 fee schedule should be voided and fees refunded to the extent that they exceed the amount payable under the 1966 fee schedule. They contend that "[s]ince the 1970 order was in both form and substance an amendment of

36. Since the 1970 fee schedule was a "comprehensive revision" of the 1966 fee schedule, Govt. Brief at 13, and as adopted was radically different from that earlier schedule both in concept and in scope, the Commission would not have been justified in relying on the decision which upheld the 1966 fee schedule, *Aeronautical Radio, Inc. v. United States,* 335 F.2d 304 (7th Cir. 1964), *cert. denied,* 379 U.S. 966, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965).

37. *See* notes 24, 27 *supra.*

38. "Within days after the *NCTA* decision was handed down, the Commission began to receive demands, requests, petitions, letters, protests and a variety of other forms of challenge to the fees it had collected since 1970, all seeking to have the fees they had paid refunded." Govt. Brief at 25 (footnote eliminated). Although most refund requests were filed after payment, some parties protested at the time of payment,

NAB Brief at 15–16, and it does not appear that the Commission has distinguished between the two. Some protests were made long before the *NCTA* decision. *See, e. g.,* J.App. 126–27.

39. It is significant that of the other three agencies to have imposed annual fees under the IOAA, all three refunded them *in their entirety* following *NCTA. See* 39 Fed.Reg. 39734 (November 11, 1974) (Atomic Energy Commission); *Hearings on Public Works for Water and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1975 Before the Subcomm. on Public Works Appropriations of the Senate Comm. on Appropriations,* 93d Cong., 2d Sess., pt. 5, at 3946–47, 4045–46 (1974) (Federal Power Commission); *Investment Advisors Act Release* No. 486 (November 14, 1975) (Securities and Exchange Commission).

the pre-existing schedule, its invalidity would leave standing the prior rules containing the 1966 Schedule," NAB Brief at 57 (footnote eliminated), *citing Williams v. Washington Metropolitan Area Transit Commission,* 134 U.S.App.D.C. 342, 363 n.100, 415 F.2d 922, 943 n.100 (1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). In the *Williams* case, this court did order refund of transit fares collected under an invalid fare structure to the extent that they exceeded the fare payable under the previous fare structure. The present situation, however, is distinguishable because of the existence of a congressional mandate, expressed in the IOAA, that government agencies should become, through the assessment of appropriate fees, "self-sustaining *to the full extent possible.*" 31 U.S.C. § 483a (1970) (emphasis added). It is our interpretation of this mandate that the Commission should retain the maximum portion of the fees collected that would be permissible under the principles announced in *NCTA, New England Power,* and the statute.

■ What proportion this is, we do not know; so we remand this case to the agency with instructions that it initiate proceedings to recalculate the 1970 fee schedule in accordance with the "value to the recipient" standard laid down in *NCTA,* as interpreted in this case and the other fee cases decided by this court today.[40] Briefly, we have interpreted the "value to the recipient" standard to include a number of specific requirements. First, the Commission must *justify* the assessment of a fee by a clear statement of the particular service or benefit which it is expected to reimburse. Second, it must calculate the *cost basis* for each fee assessed. This involves (a) an allocation of the specific expenses which form the cost basis for the fee to the smallest practical unit; (b) exclusion of any expenses incurred to serve an independent public interest; and (c) a public explanation of the specific expenses included in the cost basis for a particular fee, and an explanation of the criteria used to include or exclude particular items. Finally, the Commission must set a fee calculated to return this cost basis at a *rate* which reasonably reflects the cost of the services performed or value conferred upon the payor. The fees may be imposed only on beneficiaries of agency services who satisfy the criteria of *NCTA* and *New England Power.*[41]

Having calculated a proper fee under these guidelines, the Commission should refund that portion of the money which was collected in excess thereof. We contemplate that this will be a general undertaking by the Commission, involving all fees collected from the broadcasters under the 1970 fee schedule and not limited to those sums paid by parties to this lawsuit.[42]

*Judgment accordingly.*

TAMM, Circuit Judge, concurring:

With one limited exception, I fully concur in Judge MacKinnon's excellently crafted opinion for the court in these eighty-one consolidated cases, and in the companion cases also decided today, *Capital Cities Communications, Inc. v. FCC,* Nos. 75–1503

---

40. *National Cable Television Assn., v. FCC,* 180 U.S.App.D.C. ——, 554 F.2d 1094 (1976); *Electronic Industries Assn. v. FCC,* 180 U.S.App. D.C. ——, 554 F.2d 1109 (1976); *Capital Cities Communications, Inc. v. FCC,* 180 U.S.App. D.C. ——, 554 F.2d 1135 (1976).

41. This summary should not be read as limiting the applicability to this case of any of the principles stated in the other cases decided today. The linchpin of all these companion cases, *see* note 39 *supra,* is the definition of a valid fee under the IOAA. Although particular characteristics of such a fee have been discussed in separate cases as their facts best raise the issues, in recalculating its various fees on remand the FCC should attempt to meet all the objections we have raised regardless of where they appear.

42. In taking this action, we are not asking the FCC to engage in "retroactive rulemaking." *See* NAB Reply Brief at 31–34. The procedures on remand are intended to produce no new rule which would impose new obligation or involve additional parties; they will merely calculate the amount of the refund which will effectuate the statutory intent of the IOAA. *Cf. Addison v. Holly Hill Co.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). Such a procedure is no more "retroactive rulemaking" than the one requested by petitioners.

*et al.,* 180 U.S.App.D.C. ——, 554 F.2d 1135 (decided December 16, 1976). My sole reservation concerns how far this court should go in these decisions in attempting to define the content of the "value to the recipient" standard of the Independent Offices Appropriations Act, 31 U.S.C. § 483a (Supp.1975). The Supreme Court's decision in *National Cable Television Assn., Inc. v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974) (*NCTA*) apparently read this phrase as *the* "measure of the authorized fee"[1] that may be charged by a federal agency under the Act. The Supreme Court's narrow interpretation in *NCTA* seemingly eliminates the other considerations clearly sanctioned by the statutory language[2] with the implied admonishment that they not be "read literally."[3] In light of this substantial diminution of agency discretion in setting "fair and equitable" fees, I do not believe that we should now attempt to limit further the applicable statutory standard by peremptorily defining "value to the recipient" as including only the costs and not also the value of the benefits bestowed on a regulatee.

Of course, as the court holds in these cases, if an agency chooses a cost basis approach, as the FCC did in its 1970 fee schedule being challenged here and in *Capital Cities,* it should be required to identify the specific items of cost and demonstrate how they are related to the benefits for which the fee is assessed. As I read *NCTA,* however, that case does not dictate that the proportion-of-cost basis is the only acceptable method of determining a proper fee. Such a requirement would implicitly limit all definitions of value to some proportion of the agency's costs. It would also prevent the agency from becoming self-sustaining. Some of its costs simply could not be directly related to benefits conferred on those regulated, particularly where the benefit

may be a service, license, privilege, publication or "similar thing of value or utility"[4] for which the discrete cost basis may be incalculable. What for instance is the cost basis of a "privilege" or "license" for which the Act permits reimbursement?

I am not convinced that *NCTA* prohibits the Commission from developing a fee schedule through a measure of "value to the recipient" that is not initially related to its costs. Thus, for example, the Commission by rulemaking could determine for each class of fees what factors best reflect the value of that benefit to the regulatee and then calculate a fee based on those criteria. As it now stands, however, the court's formulation of the statutory standard artificially limits all definitions of value to a cost basis that in certain cases may be largely hypothetical.

Any limitation on the "value to the recipient" standard of the Act has far-reaching implications for the fee-setting authority of federal regulatory agencies in general. While I am not insensitive to the need finally to end this extensive and extended litigation, I believe that it is best left first to the agencies to establish the proper criteria for determining what constitutes "value to the recipient" and, if necessary, ultimately to the courts in cases where the issue is clearly presented and thoroughly briefed and argued.

I would remand these cases to the Commission to determine cognizable standards for setting fees within the framework of "value to the recipient" as delimited by *NCTA* and, once such standards have been established, to calculate the refunds due.

---

**1.** 415 U.S. 336, 343, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

**2.** Section 483a expressly provides that the fees must be

    fair and equitable taking into consideration direct and indirect cost to the Government,

value to the recipient, public policy or interest served, and other pertinent facts . . .
31 U.S.C. § 483a (Supp.1975).

**3.** 415 U.S. at 341, 94 S.Ct. 1146; *see id.* at 359, 94 S.Ct. 1146 (Marshall, J., dissenting).

**4.** 31 U.S.C. § 483a (Supp.1975).